UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 09-38 (MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S POSITION |
| v. | ) | WITH RESPECT TO SENTENCING |
| | ) | |
| KAMAL SAID HASSAN, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota, Assistant United States Attorney Charles J. Kovats, Jr., John Docherty, LeeAnn K. Bell and Department of Justice Trial Attorney William M. Narus hereby submits its position with respect to sentencing of Defendant Kamal Said Hassan ("Hassan" or "defendant").   The government anticipates serving and filing a motion pursuant to U.S. Sentencing Guidelines (U.S.S.G.) § 5K1.1.

## I.    BACKGROUND ON SOMALIA.

At Common Appendix I, the government presents a factual background on Somalia that is relevant to the sentencing proceedings against the following defendants:

> *United States v. Mahamud Said Omar*, 09-CR-242 (MJD/FLN)
> *United States v. Kamal Said Hassan*, 09-CR-38 (MJD/FLN)
> *United States v. Salah Osman Ahmed*, 09-CR-50 (MJD/FLN)
> *United States v. Abdifatah Yusuf Isse*, 09-CR-50 (MJD/FLN)
> *United States v. Adarus Abdulle Ali*, 09-CR-317 (MJD/FLN)
> *United States v. Omer Abdi Mohamed*, 09-CR-352 (MJD/FLN)
> *United States v. Ahmed Hussein Mahamud*, 11-CR-191 (MJD/FLN)

This common background is provided at Common Appendix I to the sentencing position papers filed in the each of the cases described above.

## II.    A MINNESOTA PIPELINE OF SUPPORT TO SOMALIA.

At Common Appendix II, the government submits an overview of the offenses, defendants, and facts and circumstances describing the conduct at issue.  Like Common Appendix I, Common Appendix II is an identical document submitted in each case described above.  The specific conduct of the defendant is set forth in more detail in Section III. B below.

## III.   THE CASE AGAINST THE DEFENDANT, KAMAL SAID HASSAN

### A.    The Charge of Conviction

On February 18, 2009, defendant Hassan entered pleas of guilty to a two-count Information, charging him with Providing Material Support to a Conspiracy to Kill Overseas, in violation of 18 U.S.C. § 2339A, and Providing Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B.   Each offense carries a statutory maximum sentence of 15 years' imprisonment, a maximum term of supervised release of life, a $250,000 fine, and a $100 special assessment.

On August 12, 2009, defendant Hassan entered a guilty plea to a Superseding Information, charging him in a third count with Making False Statements to the Federal Bureau of Investigation (FBI), in violation of 18 U.S.C. § 1001.   That offense carries a statutory maximum sentence of eight years' imprisonment, a maximum term of supervised release of three years, a $250,000 fine, and a $100 special assessment.

### B.    The Offense Conduct

#### 1.    *February 18, 2009, Factual Basis and Plea Colloquy*

2

The defendant admitted the following on February 18, 2009, in the factual basis of the plea agreement he entered to the two counts of providing material support.

In or between November 2007 and August 2008, defendant Hassan (1) "knowingly provided material support and resources, namely himself, knowing and intending that the material support and resources were to be used in preparation for and in carrying out a conspiracy to kill, kidnap, maim and injure persons in a foreign country"; and (2) "knowingly provided material support and resources to al-Shabaab by providing himself to work under the direction and control of al-Shabaab, knowing that al-Shabaab has engaged or engages in terrorist activity and terrorism." Plea Agreement at 2-3. Defendant Hassan traveled to Somalia to fight against the Ethiopian government troops present in Somalia. His "desire to fight was motivated by the defendant's religious and patriotic beliefs that the Ethiopians should leave Somalia. He traveled to Somalia to fight against the Ethiopians in order to cause the removal of Ethiopian troops from Somalia." *Id.*

As he testified at the trial of *United States v. Mahamud Said Omar*, the defendant was not truthful when appearing before Chief Judge Rosenbaum to plead guilty. He stated that he met "Abdullah" around September 2007 and was told that Ethiopian troops had invaded Somalia and were committing atrocities. *See* February 18, 2009 transcript of plea colloquy at 23. The defendant claimed that Abdullah bought tickets to fly to Somalia, which the defendant later acknowledged was untrue. Defendant Hassan also falsely stated that he had stayed at a house in Mogadishu for a month with other men from the Twin Cities and left from Mogadishu all the way to the training camp, where he

and others proceeded to build it.   *Id.* at 25.   This, too, was not true, since he had resided at the Marka and Baraawe safe-houses.   He said that he began AK-47 training and hand-to-hand combat training that took approximately four months.   When the camp ended, a media group filmed the recruits training and giving speeches and then the recruits were taken to a different place near the city of Kamsuma.   The defendant stated:

> And while I was there, your Honor, I decided to actually escape from this group and leave because I didn't agree with their ideology and their way of life, your Honor.   So I left the camp after I got information about my family. I talked to them.   They were here in Minnesota.   And I decided to leave because I didn't want to be a part of them anymore.   So I left that group, your Honor, and after I escaped I took a couple of months but I made it all the way to Yemen in the Middle East.   And after that I reached out to my parents.

*Id.* at 26.   The defendant stated that he had been interviewed by the FBI and "gave them information and answered all the questions that they needed" and has been cooperating ever since.   *Id.* at 27.

In response to a questioning from the Assistant U.S. Attorney (AUSA) and counsel, the defendant stated that he was filmed firing a weapon at the training camp and that he understood that the Ethiopians that he would be fighting against were acting with the approval or support of the Ethiopian government.   *Id.* at 29-30.

### 2.   *August 12, 2009 Factual Basis and Plea Colloquy*

The defendant admitted the following in the factual basis of the plea agreement he entered on August 12, 2009, in which he admitted making false statements to the FBI:

> On February 9, 2009, in the State and District of Minnesota, the defendant informed a special agent of the Federal Bureau of Investigation that, after finishing training at an al-Shabaab training camp in Somalia, he left al-Shabaab and traveled to Yemen without taking any further acts on behalf

4

of al-Shabaab.   The defendant agrees that this statement was false because, in fact, after finishing training, the defendant continued to work with members of al-Shabaab and follow orders of al-Shabaab in Somalia.

At the plea colloquy, defendant Hassan elaborated in response to questions from the AUSA.   He admitted that he had been untruthful during proffer sessions about his activities after completing the training camp and, in fact, after finishing the al Shabaab training camp, he had participated in combat on one occasion with members of al Shabaab.   He admitted that he had been untruthful about going straight to Yemen from the training camp.   Finally, he admitted to withholding the identities of people involved with the conspiracy during proffer sessions.   *See* August 12, 2009 transcript of plea colloquy at 9-11.

### 3.     *The Defendant's Testimony*

During the course of the investigation, the defendant was interviewed by agents of the FBI and provided information about himself, his knowledge of the conspiracy, and his observations.   On or about October 9-11, 2013, the defendant provided the following sworn testimony when called as a witness in the trial of *United States v. Mahamud Said Omar* about the same topics.   From these statements of the defendant, the following additional information about the defendant and his relevant conduct is known.

### a.     *Personal Background*

The defendant Hassan testified that he and his family had left Somalia in 1991 and emigrated to the United States in 1996, and to Minnesota in 1998.   The defendant worked various jobs in the Twin Cities, including stints at McDonald's, a bank, and as a

5

delivery driver for his father's business. The defendant graduated from Wayszata High School and took general education classes at MCTC.   He is married with one child.

### b.        Ramadan 2007 until Departure on December 6, 2009

Defendant Hassan testified that he agreed to go to Somalia to fight against the Ethiopians during Ramadan 2007 while spending time at the Abubakr As-Saddique mosque.   The defendant had become more religious in the summer of 2007 and slept at a mosque for the first time during that Ramadan.   Salah Ahmed (*See* Attachment 2, Number "6") approached him with the idea of traveling to Somalia and he soon learned that others attending the mosque were involved in the plan.   Without talking to his family or the leadership at the mosque, the defendant agreed to travel to Somalia to take up arms against the Ethiopian military.   He testified that the group's plan was to fight against the Ethiopian troops.   The fighting would include the use of guns and would include trying to kill the Ethiopians perceived to have invaded Somalia.   Defendant Hassan explained that he was motivated by a desire to defend Somalia from Ethiopians, a belief that it was going to be an adventure, and a hope that he could reconnect with his fiancé in Somalia.

Once he agreed to join the conspiracy, defendant Hassan and the other members of the conspiracy engaged in fundraising and held meetings around the Minneapolis area. During this period, the defendant stated that his interest in the trip grew as he felt a connection with the other travelers and had traveling companions.   The defendant recounted the subterfuge he used with his family to retrieve his passport.   Shirwa Ahmed (*See* Attachment 2, Number "2"), who worked at a travel agency, and the

6

defendant told the defendant's father that they were going to Saudi Arabia to attend the hajj.   Shirwa Ahmed changed his mind about assisting the defendant after the defendant's father made clear to Shirwa Ahmed that the defendant's father would hold him responsible if anything went wrong. Omer Mohamed (*See* Attachment 3, Letters "AA") came up with a plan to show the defendant's parents a fake itinerary that indicated that the defendant would be traveling to the hajj.   The defendant and his co-conspirators presented the fake itinerary to the defendant's father and convinced him to relinquish the defendant's passport.   The defendant's family also provided the defendant with $700, which went toward the defendant's expenses for the trip to Somalia.

c.   ***December 2007 until January 2009***

The defendant's travel route through Mogadishu to Marka and Baraawe before arriving at the training camp is recounted in Appendix 2.   Of note, the defendant learned about the goals and operations of al Shabaab and that their objectives were not limited to expelling the Ethiopians.   Moreover, the defendant testified that Shirwa Ahmed had reservations about traveling to Somalia to join the men, because he had been told by scholars in Saudi Arabia that traveling to Somalia was not a good idea.   Omer Mohamed and Khalid Abshir (*See* Attachment 2, Number "7") convinced Shirwa Ahmed to join the men in Marka, and he relented.

The defendant and recruits from Minneapolis traveled to the training camp near Kamsuma and began constructing the camp.   Salah Ahmed and Abdifatah Isse (*See* Attachment 2, Number "5") left the camp in the first couple weeks and never returned. Shirwa Ahmed also left, but was persuaded to return and was punished for his departure.

7

Senior members of al Shabaab and al Qaeda in East Africa arrived to train the recruits including "Amo" (*See* Attachment 3, Letter "D"), Saleh Nabhan (*See* Attachment 3, Letter "H"), Sheikh Fuad (*See* Attachment 3, Letter "I"), Jehad Mostafa (*See* Attachment 3, Letter "F"), and Omar Hammami (*See* Attachment 3, Letter "E"). The recruits from Minneapolis were given lectures from Sunday through Wednesday, which focused on Sharia law. Sheikh Fuad and Omar Hammami were among those that lectured. Al Shabaab members taught the recruits ambush techniques and discussed suicide bombers who had targeted African Union troops, and the United States was blamed for the Ethiopian invasion and the death of Aden Ayrow, an al Shabaab commander. The defendant appeared on an al Shabaab propaganda video, encouraging others to travel to Somalia and join al Shabaab as it pursued its global mission. The defendant testified that the speech had been written for him by Omar Hammami.

Following graduation from al Shabaab's training camp, the defendant and other members of al Shabaab, including three of his co-conspirators from Minneapolis, traveled to Baardale and attacked a convoy of Ethiopians traveling in Somalia. One member of al Shabaab was killed and the defendant did not know whether any members of the Ethiopian military were killed. Following the ambush, the defendant returned to the training camp and encountered Mohamed Hassan (*See* Attachemnt 2, Number "10") and Mustafa Salat (*See* Attachemnt 2, Number "11"), who had arrived at the training camp. The defendant and his cohorts were congratulated by Saleh Nabhan, who said they could now be trusted. The defendant appeared in an al Shabaab propaganda video alongside Dahir Mohamud Gure (*See* Attachment 3, Number "1") and Ahmed Ali Omar (*See*

8

Attachment 3, Number "6") in which Ahmed Ali Omar encouraged men to join them in Somalia.

### d.   January 2009 to April 2009

The defendant made contact with the FBI through his family and agreed to meet with the FBI and an AUSA in Yemen, where he admitted that he had traveled to Somalia, participated in a training camp, and could be seen on the training camp propaganda video. The defendant admitted that he had joined al Shabaab and he provided information on some of his fellow recruits from Minneapolis as well as some of the men he encountered in Somalia.   The defendant lied initially about the following matters, among others: that he had escaped after the training camp without taking further action on behalf of al Shabaab, that he had resided in a safe-house in Marka, that he had encountered Saleh Nabhan, and that Omer Mohamed had assisted him in Minneapolis.   The defendant recounted elements of the story he had told the FBI in Yemen when he entered his guilty plea before Chief Judge Rosenbaum.

In early April 2009, the defendant's story unraveled when Jehad Mostafa sent a link to the video al Shabaab had produced of the ambush of Ethiopian troops near Bardaale.   *Id.* at 154.   The defendant admitted to his role in the ambush, to his time in Marka, and identified the co-conspirators he had left out.   He entered a guilty plea to lying to the FBI in August 2009.

### C.   The Pertinent Guideline Calculations Agreed to By the Parties

In the plea agreements entered on February 18, 2009, and August 12, 2009, the parties agreed to the following Guideline calculations:

*Count 1*

| | | |
|---|---|---|
| Base Offense Level, § 2X1.1(c), 2A1.5: | 33 | (Plea Agreement, para. 6(a)) |

*Count 2*

| | | |
|---|---|---|
| Base Offense Level, § 2M5.3: | 26 | (Plea Agreement, para. 6(a)) |

*Count 3*

| | | |
|---|---|---|
| Base Offense Level, § 2J1.2(a) | 14 | (8/12/2009 Plea Agreement, para. 8(a)) |
| Obstruction of Justice, § 3C1.1 | +2 | (Plea Agreement, para. 8(c)) |

| | | |
|---|---|---|
| Acceptance of responsibility, §§ 3E1.1(a), (b): | -3 | (*Id.* para. 6(d)) |

The parties agreed that the offenses charged in Count Three form one group with the offenses charged in the underlying two-count information.

The parties agreed that a two-level increase under § 2M5.3(b)(1)(E) for providing funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act "may be applicable." (*Id.* para. 6(b)). (The second plea agreement, entered on August 12, 2009, to making false statements to the FBI did not contain this language.) The parties agreed that the defense is free to argue that he played a minor role pursuant to guideline section 3B1.2(b) and that the government reserves its right to oppose such a reduction.

The government reserved the right to argue that a 12-level adjustment under § 3A1.4(a) applies because the defendant's convictions are felonies involving or promoting a crime of terrorism. The defendant reserved his right to argue that this section did not apply. (*Id.* para. 6(c)).

Finally, the parties agreed that if the adjustment under § 3A1.4(a) applies, the defendant's Criminal History Category would be VI; otherwise, the criminal history category is I.    (2/18/09 Plea Agreement, para. 6(g); 8/12/09 Plea Agreement para. 8(h)).

## IV.    THE PSR's CALCULATIONS AND RECOMMENDATIONS.

On March 21, 2013, the United States Probation Office disclosed the PSR in this case. The PSR calculates defendant's applicable guideline range at 456 months' imprisonment, based on a total offense level of 43, criminal history category VI, and a statutory maximum sentence of 456 months' imprisonment.    (PSR ¶¶ 161, 162).

The PSR guideline calculations are summarized as follows:

*Count 1*

| | | |
|---|---|---|
| Base Offense Level, § 2A1.5: | 33 | (PSR ¶ 101) |
| Victim Related Adjustments: | | |
| Felony involving/promoting crime of terrorism § 3A1.4(a): | +12 | (PSR ¶ 104) |
| Adjustment for Obstruction of Justice: | | |
| Obstructing or Impeding the Administration of Justice § 3C1.1: | +2 | (PSR ¶ 106) |
| Adjusted Offense Level, Count 1: | 47 | |

*Count 2*

| | | |
|---|---|---|
| Base Offense Level, § 2M5.3(a): | 26 | (PSR ¶ 108) |
| Specific Offense Characteristics: | | |
| Providing money for commission of violent act, § 2M5.3(b)(1)(D): | +2 | (PSR ¶ 109) |
| Victim Related Adjustments: | | |
| Felony involving/promoting crime of terrorism § 3A1.4(a): | +12 | (PSR ¶ 110) |

Adjustment for Obstruction of Justice:

Obstructing or Impeding the Administration of Justice § 3C1.1:     +2     (PSR ¶ 112)

Adjusted Offense Level, Count 2:     42

*Count 3*

Base Offense Level, § 2J1.2(a):     14     (PSR ¶ 114)

Specific Offense Characteristics:

Victim Related Adjustments:

Felony involving/promoting crime of terrorism § 3A1.4(a):     +12     (PSR ¶ 115)

Adjustment for Obstruction of Justice:

Obstructing or Impeding the Administration of Justice § 3C1.3:     +3     (PSR ¶ 119)

Adjusted Offense Level, Count 3:     29

***

Greater of the Adjusted Offenses Levels Above     47

Acceptance of responsibility, §§ 3E1.1(a), (b):     -3     (PSR ¶ 122)

Total Offense Level:     43     (PSR ¶ 102)

Criminal History Category:     VI     (PSR ¶ 107)

Guideline Range:     456 months     (PSR ¶ 162)

Supervised Release:     Any term up to life     (PSR ¶ 165)

Fine:     $25,000-$250,000     (PSR ¶ 171)

The PSR also indicates that the information provided does not constitute a recommendation by the USPO for a departure or a variance.

## V.    GOVERNMENT'S RESPONSE TO THE PSR.

### A.    Objections to the PSR

The government has three objections or proposed amendments to the PSR.

First, as to the description of defendant Ahmed Abdulkadir Warsame, charged in the Southern District of New York, at paragraph 18 of the PSR, the government notes that on December 21, 2011, Ahmed Warsame pleaded guilty to all nine counts of the indictment.   The information relating to Ahmed Warsame's pleas of guilty was not publicly available at the time the PSR was published.

Second, the FBI agents and Assistant U.S. Attorney began to debrief defendant Hassan in January 2009 rather than "late 2008," as stated in the PSR at paragraph 93.

Third, at paragraph 98, the PSR states that "the defendant committed the obstructive conduct from late 2008 until his first guilty plea hearing on February 18, 2009."   The defendant's obstructive conduct with respect to his false statements to the FBI ran from January 2009 until early April 2009 and included the statements he made to the Court during the entry of his guilty plea on February 18, 2009. He was confronted with his untrue statements in April 2009.

### B.    The Government's Guideline Calculations

The government agrees with the guideline calculations in the PSR. The government does not believe any other Specific Offense Characteristics or Victim-Related Adjustments are appropriate.   The government also concurs that the appropriate guideline range is 456 months' imprisonment based on a Total Offense Level of 43 and a Criminal History Category of VI.

13

**C.      The Terrorism Adjustment Under U.S.S.G. § 3A1.4(a) Applies**

The defendant disputes the PSR's correct application of U.S.S.G § 3A1.4(a), the

terrorism adjustment, which increases his Offense Level by 12 levels and his Criminal

History Category to VI.   The government concurs with the USPO that the terrorism

adjustment should apply to this defendant's case.

*1.      Text of the Terrorism Enhancement*

Section 3A1.4 is categorized under chapter three as a victim-related adjustment for

terrorism.   Section 3A1.4 was amended in 1996 by the Antiterrorism and Effective

Death Penalty Act.

Section 3A1.4 states, in pertinent part, that:

> (a) If the offense is a felony that involved, or was intended to promote, a
> federal crime of terrorism, increase by 12 levels; but if the resulting offense
> level is less than level 32, increase to level 32.

> (b) In each such case, the defendant's criminal history category from
> Chapter Four (Criminal History and Criminal Livelihood) shall be Category
> VI.

There are four application notes to Section 3A1.4. Application Note 1 states that

the term "federal crime of terrorism" has the meaning given that term in 18 U.S.C.

§ 2332b(g)(5).   Section 2332b states, in pertinent part:

> (5) the term "Federal crime of terrorism" means an offense that–

>> (A)     is calculated to influence or affect the conduct of government
>> by intimidation or coercion, or to retaliate against government
>> conduct; and

>> (B)     is a violation of –

14

> (i)   . . . 956(a)(1) (relating to conspiracy to murder, kidnap, or maim persons abroad), . . . 2339A (relating to providing material support to terrorists), 2339B (relating to providing material support to terrorist organizations) . . . .

Application Note 2 concerns harboring, concealing and obstruction of justice offenses.  It states, "For purposes of this guideline, an offense that involved (A) harboring or concealing a terrorist who committed a federal crime of terrorism (such as an offense under 18 U.S.C. § 2339 or § 2339A); or (B) obstructing an investigation of a federal crime of terrorism, shall be considered to have involved, or to have been intended to promote, that federal crime of terrorism."

Application Note 3, which concerns "Computation of Criminal History Category," provides that, "[u]nder subsection (b), if the defendant's criminal history category as determined under Chapter Four (Criminal History and Criminal Livelihood) is less than Category VI, it shall be increased to Category VI." USSG § 3A1.4 cmt. n.3 (2012). Application Note 3 serves as an addendum to § 3A1.4's subsection (b) by clarifying that § 3A1.4 does not require a prerequisite criminal history category VI for its application. Application Note 3 provides for the automatic increase of criminal history to category VI. The increase applies to the § 3A1.4 application notes, except for Application Note 4.

Application Note 4 is a stand-alone provision for upward departure, rather than a Section 3A1.4 adjustment, in cases where the defendant's actions do not meet the definition of "federal crime of terrorism" as defined in 18 U.S.C. § 2332b(g)(5).   The predetermined increases of offense level and criminal history category that are applicable to § 3A1.4 are not applicable to Application Note 4.   The Commission noted that an

upward departure rather than a specific guideline adjustment was used because of the infrequency of this type of case and so that the court could assess the harm caused by these offenses on a case-by-case basis.

Viewed in the aggregate, these amendments reflect an understanding by both the Congress and the Sentencing Commission that "an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." *United States v. Meskini,* 319 F.3d 88, 92 (2d Cir.), *cert denied sub nom. Haouari v. United States*, 538 U.S. 1068 (2003). "We have recognized that 'the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation.'" *United States v. Stewart,* 590 F.3d 93, 143 (2nd Cir. 2009) (quoting *Meskini, supra,* 319 F.3d at 92).

### 2.    *Two Theories of Application of the Section 3A1.4 Enhancement*

The disjunctive phrases in § 3A1.4 makes clear that the predicate offense must either (1) "involve" a federal crime of terrorism or (2) be "intended to promote" a federal crime of terrorism and that each clause has a separate meaning.   The United States has not been able to locate any Eighth Circuit precedent on the application of § 3A1.4.

### a.    *The "Involve" a Federal Crime of Terrorism Theory*

For § 3A1.4 to apply under this prong, the offense must have been "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate

16

against government conduct," *and* the offense must be one of those enumerated in § 2332b(g)(5).   The government submits that the Court must determine by a preponderance of the evidence that the defendant's offense was "calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct."   *United States v. Ashqar*, 582 F.3d 819, 824 (7th Cir. 2009) (preponderance of the evidence standard applies to consideration of the terrorism enhancement); *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010); *United States v. Jayyousi*, 657 F.3d 1085, 1115 (11th Cir. 2011).   The Court may draw reasonable inferences regarding the intent of defendant's crime based upon the evidence.   *See United States v. Mohammed*, 693 F.3d 192, 201-02 (D.C. Cir. 2012) (affirming district court's application of the terrorism enhancement where the court "pointed to specific statements in the record – which Mohammed does not dispute he made – from which it [the district court] drew plausible inferences); *United States v. Chandia*, 675 F.3d 329, 340-41 (4th Cir. 2012) (affirming application of terrorism enhancement where the court "reasonably inferred by a preponderance of the evidence" that the defendant intended to advance Lashkar's terrorist purpose in providing material support to a leader of Lashkar). Although the Eighth Circuit has not considered the issue of whether the district court must make specific factual findings in order to apply the terrorism enhancement, the government assumes for purposes of this sentencing memorandum that that the Eighth Circuit would follow the example of the Fourth Circuit.   *See Chandia*, 675 F.3d at 334 (citing *Chandia I*, 514 F.3d 365, 376 (4th Cir. 2008) (if the sentencing court concludes

17

that the terrorism enhancement is applicable, it was to "identify the evidence in the records that supports its determination").

    **i.**  ***"Calculated to influence or affect" conduct of government, or to "retaliate against" government conduct***

   In *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), the Second Circuit made clear that for the terrorism enhancement to apply, the law requires a showing only of a specific intent "to commit an offense that was 'calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'"  *Awan*, 607 F.3d at 317 (quoting 18 U.S.C. § 2332b(g)(5)).  The Court has been clear, however, that the statute does *not* require "proof of the defendant's particular motive."  *Id.*  The defendant's "motive is simply not relevant."  *Id.*  "[A] person may intend and may commit an offense that is so calculated even if influencing or retaliating against government is not his personal motivation."  *Id.*  By way of example, "a person who murders a head of state" commits an act of terrorism if he knows "that his crime will influence or affect the conduct of government . . .  even if his particular motivation in committing the murder is to impress a more established terrorist with his abilities."  *Id.* In a second example, the Court explained, "A hired assassin who kills a political leader at the behest of a terrorist organization can hardly disclaim that his crime was calculated to influence the conduct of government simply because he was motivated by greed rather than politics."  *Id.* at 318.

   Thus, the Second Circuit went on to focus on the defendant's knowledge:

18

> If the evidence showed that Awan engaged in criminal conduct *with knowledge that confederates solicited his actions* to effectuate politically motivated bombings in India, or homicidal attacks on that country's security forces or its political leaders, such proof could demonstrate that Awan's crimes were calculated to influence the conduct of government even if he was not personally motivated by that object.

*Id.* at 317-18 (emphasis added).

The Court noted that the "calculated to influence" language had been referred to by some courts as the "motivational element." The Court explained that, in fact, "the section is better understood as imposing a requirement that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government conduct." *Id.* at 317 (citing *United States v. Stewart*, 590 F.3d 93, 138 (2d Cir. 2009)).

The Eleventh Circuit stated that the Court's analysis "focuses on the intended outcome" of the defendant's crimes – "i.e., what the activity was calculated to accomplish, not what the defendant's claimed motivation behind it was." *Jayyousi*, 657 F.3d at 1115 (citations omitted); *cf. United States v. El-Mezain*, 664 F.3d 467, 571 (5th Cir. 2011) (applying the terrorism enhancement to defendant's conviction for supporting Hamas's fundraising arm because defendant knew Hamas had the goal of influencing government through violent jihad, and the evidence showed that defendant supported that goal).

ii.    *"Conduct of Government" or retaliation for "Government Conduct"*

The "government" affected need not be the government of the United States. Courts have held that a Colombian terrorist group's attempt to influence the government of Colombia met the requirements of the statute. *See United States v. Puerta*, 249 Fed.Appx. 359, 360 (5th Cir. 2007) (*per curiam*) (The court found that § 2332b(g)(5) applied to "Puerta and his co-conspirators [who] sought to trade drugs and money for weapons to supply the United Self Defense Force[s] of Colombia, a designated foreign terrorist organization that opposes the Colombian government."); *United States v. DeAmaris*, 406 F. Supp. 2d 748 (S.D. Tex. 2005) (concluding "the word 'government' as used in § 2332b(g)(5)(A) includes foreign governments and is not limited to the government of the United States" and applying the enhancement to a group opposed to the government of Colombia).   Courts have also applied the enhancement with respect to Egypt and Pakistan.   *See Stewart*, 590 F.3d at 144 (quoting without disapproval the district court's application of the terrorism enhancement to a defendant whose conduct was "calculated to affect the conduct of the Egyptian government though intimidation and coercion"); *United States v. Aref*, No. 04-CR-402, 2007 WL 804814, at 2 (N.D.N.Y. Mar. 17, 2007) (finding enhancement applied to conduct calculated to influence or affect President of Pakistan).

The Sixth Circuit applied the enhancement to Hizballah's attempts to influence Israel, disregarding a defense argument that Israel no longer constituted a "government" because it was occupying Lebanon in contravention of international law.   *United States v.*

20

*Assi*, 428 Fed. Appx. 570, 574-75 (6th Cir. 2011).   There, the defendant was accused of attempting to provide global positioning satellite modules, night vision goggles, and a thermal imaging camera to a terrorist organization, Hizballah.   The Court explained, "Surely Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person who has pled guilty to providing support to a foreign terrorist organization is subject to § 3A1.4."   *Id.* at 575.

### iii.       The Offense Need Not Be Violent

In *Assi,* the Sixth Circuit also responded to a defense argument that his crime was not violent.   The Court observed that, "Not all of the crimes listed in 18 U.S.C. § 2332b(g)(5)(B) are necessarily violent," citing as examples "1030(a)(1) (relating to protection of computers)," "1030(a)(5)(A) resulting in damage as defined in 1030(c)(4)(A)(i)(II) through (VI) (relating to protection of computers)," "1361 (relating to government property or contracts)," and "1362 (relating to destruction of communication lines, stations, or systems)."   *Assi,* 428 Fed. Appx. At 574.   Thus, the Sixth Circuit adhered to the plain language of the statute and found "that a non-violent offense can be a federal crime of terrorism."   *Id.*   The Sixth Circuit held that the terrorism enhancement was not limited to acts of violence; a nonviolent offense could qualify as a "federal crime of terrorism" as defined by 18 U.S.C. § 2332b(g)(5).   *Id.*

### b.       The "Intended to Promote" Theory

The Second Circuit has noted that by using the term "intended to promote" the terrorism enhancement casts a "broader net" than the statutory definition alone.

21

*Stewart,* 590 F.3d at 137.   In order to satisfy the requirements of the terrorism enhancement, "[t]he criminal conduct at issue need not itself meet the statutory definition of a federal crime of terrorism if 'a goal or purpose [of the defendant's act] was to bring or help to bring into being a crime listed in'" the statutory definition.   *Id.* (quoting *United States v. Mandhai*, 374 F.3d 1243, 1247 (11th Cir. 2004).   Thus, the "intended to promote" theory applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." Therefore, in order to apply under the "intend to promote" theory of applicability, "the defendant's offense need not itself be 'calculated' as described in Section 2332b(g)(5)(A)."   *Id.*

The Seventh Circuit has upheld the application of § 3A1.4 in a case under the "intended to promote" theory in *United States v. Ashqar.*    In that case, the defendant was called before a grand jury and advised the grand jury was investigating alleged terrorist acts of Hamas.   *Ashqar*, 582 F.3d at 821.   Once before the grand jury, the defendant refused to answer the questions posed to him by the Assistant United States Attorney. *Id.*   The defendant was subsequently convicted of obstruction of justice and criminal contempt.[1]   *Id.*   At sentencing, the district court applied § 3A1.4 and sentenced the defendant to 135 months' imprisonment.   *Id.*   In upholding the district court's application of § 3A1.4, the Seventh Circuit held the defendant's conduct before the grand

---

[1]  The defendant was also charged with a racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) based on his refusals to testify but was acquitted of these offenses.   *Ashqar* at 822.

22

jury, namely obstructing an investigation "can be one way of promoting" a federal crime of terrorism.   *Id.* at 826.   The Court continued,

> Promoting a crime includes helping and encouraging that crime, and one way of furthering a crime is to try to prevent the government from finding out about it.   So long as the sentencing court finds that the defendant intended to obstruct an investigation into a federal crime of terrorism, as opposed to an investigation into more ordinary violations of the law, the court has found the intent required to apply § 3A1.4.

*Id.*

### 3.   *Applicability of Section 3A1.4 to Defendant*

In the present case, Counts One and Two of the defendant's crimes involved a federal crime of terrorism and satisfies the first theory of applicability of § 3A1.4.   First, defendant Hassan was convicted of 18 U.S.C. §§ 2339A and 2339B, which are among those enumerated offenses listed in § 2332b(g)(5)(A).   Second, the defendant's crime was calculated to influence or affect the conduct of the government, specifically, the governments of Ethiopia and the Transitional Federal Government.

In addition, Count Three was intended to promote a federal crime of terrorism, since the defendant well knew that his false statements to the FBI allowed co-conspirators to continue to operate without scrutiny from law enforcement.

### a.   *The Defendant's conduct involved an enumerated "Federal Crime of Terrorism" found at § 2332b(g)(5)(B)(i)*

On February 18, 2009, defendant Hassan entered a guilty plea to Providing Material Support to a Conspiracy to Kill Overseas, in violation of 18 U.S.C. § 2339A, and Providing Material Support to al Shabaab, in violation of 18 U.S.C. § 2339B.

Section 2332b(g)(5)(B) lists both §§ 2339A and 2339B as a "Federal Crime of Terrorism" and plainly satisfies the first element of § 3A1.4.

> **b.      The Defendant's conduct was calculated to influence or affect the conduct of government by intimidation and coercion and to retaliate against government conduct**

The defendant's commission of the offenses was also "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" and, therefore, satisfies the second and final element of § 3A1.4.

> ### i.      *Plea Agreement and Plea Colloquy*

As demonstrated by the facts stipulated to by the parties in the Plea Agreements, the defendant's plea colloquies, and his trial testimony in which he explained the offense conduct in great detail, defendant Hassan's actions were certainly calculated to have such influence or effect on the activities of the Ethiopian government and the TFG.

In his February 2009 plea agreement, defendant Hassan admitted that he provided himself (1) to a conspiracy to kill, kidnap, maim and injure people in a foreign country and (2) to work under the direction and control of al Shabaab "knowing that al-Shabaab has engaged and engages in terrorist activity and terrorism." He stated that his "religious and patriotic belief[s]" motivated him to "travel[] to Somalia to fight against the Ethiopian government troops present in Somalia" in order to "cause the removal of Ethiopian troops from Somalia." *See* Plea Agreement at 3.

At his plea colloquies, defendant Hassan responded to questions from the Court, the AUSA and his counsel. Defendant Hassan stated that he understood before he left the United States that the Ethiopians he would be fighting against were acting with the

approval or support of the Ethiopian government.   (February 18, 2009 Plea Colloquy at 29.)   In his later plea colloquy, defendant Hassan stated that he had participated in combat with other members of al Shabaab.   (August 12, 2009 Plea Colloquy at 10.) That combat was against members of the Ethiopian military present in Somalia at the request of the TFG.   (*See* Appendix 1.)

Finally, the defendant testified at the trial of Mahamud Said Omar over three days and elaborated on his offense conduct during direct examination, cross-examination, and in response to questions from the Court.   Defendant Hassan testified that before he left he understood that he and his cohorts would be fighting against the Ethiopian military present in Somalia.   Said Fidhin (*See* Attachment 1, Letter "A") told them about different battles and different ambushes that his group did in Somalia against Ethiopian troops.   In response to a question by the Court, defendant Hassan said that he knew the TFG had invited Ethiopian troops into Somalia to overthrow the Islamic courts.   The defendant understood that he would be joining Fidhin and the Islamic Courts in fighting against the Ethiopian troops invited in by the TFG.

Upon arriving in Somalia, the defendant and Isse met Fidhin and learned that they would become a part of al Shabaab, which had broken away from the Islamic Courts. Later, at the safe-house in Marka, defendant Hassan met "Amo," and learned more about the history of al Shabaab.   Amo explained that al Shabaab disagreed with the decision to retreat from the Ethiopians.   Amo informed defendant Hassan about al Shabaab's mission, stating that al Shabaab was the only true group in Somalia right now that are fighting for the people and for the religion. Amo said that the goal of al-Shabaab was to

25

take over Somalia and then take over other neighboring countries all the way to Jerusalem.   Amo also stated that al Shabaab intended to implement its own interpretation of Sharia law, which the defendant recounted as follows: if somebody stole something, they would cut their right hand off, if there was someone that committed adultery, they would stone them to death until that person dies, and if somebody commits other crimes, they can get killed or beheaded.

Upon arriving at the camp, defendant Hassan continued to learn about al Shabaab's views.   For example, defendant Hassan was taught that al Shabaab would first take over Somalia and impose Sharia law in Somalia and then move on to the next country, such as Ethiopia, and impose Sharia law there as well.   Defendant Hassan recalled discussion at the camp about a member of al Shabaab who conducted a suicide bombing using a car full of explosives at a place where African Union troops were located and testified that it was an action that garnered respect.   Defendant Hassan testified that the instructors at the camp were critical of the United States, as they suspected that it was behind the Ethiopian invasion of Somalia, and how there was anger at the United States following the death of Aden Ayrow by what was believed to be a cruise missile launched by the United States.   The video in which the defendant appears also includes evidence indicating that al Shabaab was opposed to the TFG.   At one point, the al Shabaab trainees are using a photo of the former president of Somalia, Abdullahi Yusuf, for target practice.

Following the graduation, the defendant carried out an attack on an Ethiopian military convoy with three co-conspirators from the United States.   Defendant Hassan

agreed that the purpose of the ambush was to kill as many Ethiopian soldiers as possible. One member of al Shabaab was killed in the ambush.

To summarize, the facts definitively demonstrate that defendant Hassan intended to "influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct" when he (1) traveled to Somalia to fight against the Ethiopian military in Somalia; (2) when he joined al Shabaab understanding its goals included targeting the TFG; and (3) when he participated in an ambush of an Ethiopian military convoy as it traveled within Somalia. "Element one" is satisfied because the offenses for which the defendant was convicted, 18 U.S.C. §§ 2339A and 2339B, both qualify as a "federal crime of terrorism."   "Element two" is satisfied because the defendant's admitted role in the offense, his knowledge and support of al Shabaab, and his statements and actions leave no ambiguity regarding his intent to support al Shabaab and al Shabaab's goals, and therefore were intended and calculated "to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."   As such, the "terrorism adjustment" under § 3A1.4 must apply.

### C.      *Intended to Promote*

As stated by the PSR, the defendant's false statements to the FBI triggers the terrorism enhancement because they were intended to promote a federal crime of terrorism.   As in *Ashqar*, the defendant promoted the crime of terrorism by trying to prevent the government from finding about other members of the conspiracy both in the United States and in Somalia.   That the defendant may have been motivated by avoiding

27

implicating himself further in the conspiracy or implicating others in Minneapolis does not shield him from the application of the terrorism enhancement.

## VI.   ABSENT ANY ADDITIONAL MOTIONS, THE COURT SHOULD SENTENCE THE DEFENDANT TO A GUIDELINE SENTENCE.

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence.   552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted, and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented."   *Id.* at 50.   If the court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."   *Id.*   Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities."   18 U.S.C. § 3553(a).

28

A.      **Nature and Circumstances of the Offense.**

Defendant Hassan stands before this Court convicted of committing three offenses.    First, he provided himself as material support to a conspiracy to kill overseas. This offense involved a complex international conspiracy that had as its object killing members of a foreign government's military and led to members in Somalia joining the foreign terrorist organization, al Shabaab.    The defendant and his co-conspirators hatched a plan in the United States to travel to Somalia and kill the Ethiopians present in Somalia.    Defendant Hassan and his co-conspirators misled their family members about the purpose of their trip and used the mosque as a location for planning a trip while keeping the plan secret from members of the mosque.    Defendant Hassan's co-conspirators defrauded members of the Somali community here in the Twin Cities under the pretext of a mosque being built to raise funds for their trip.    Defendant Hassan and his co-conspirators listened to lectures by Anwar al-Awlaki and ultimately left the United States in groups of two, with scheduled return flights, to avoid detection from law enforcement.

Upon arriving in Somalia, defendant Hassan learned that he would be a part of al Shabaab and that the group was focused not just on the expulsion of Ethiopian soldiers from Somalia but overthrowing the Somali government and imposing an extreme version of Sharia law beyond the borders of Somalia.    The defendant appeared on an al Shabaab propaganda video seeking recruits from the English-speaking countries and participated in an attack by al Shabaab of Ethiopian soldiers.

The nature and circumstances of the offense have involved death at every turn. Waves of men followed the defendant, and many have been killed in Somalia, including Dahir Gure, Zakaria Maruf, Abdirashid Omar, Mohamoud Hassan, Troy Kastigar, Burhan Hassan, and Abdisalan Ali.   PSR ¶¶ 77-84 Two of the men involved have participated in suicide bombings on behalf of al Shabaab in which death or injury has resulted to those in the vicinity.   The ambush in which defendant Hassan participated resulted in the death of at least one member of al Shabaab.

Second, the nature and circumstances of defendant Hassan's provision of material support to al Shabaab implicates the most serious threats against the United States. Since 2008, al Shabaab has been designated by the Secretary of State as a foreign terrorist organization based on its violent activities and threat to the national security of the United States.   The group has sheltered members of al Qaeda in East Africa who have killed Americans, has aligned with al Qaeda, and has killed at least one American in its own right during the Kampala bombings.   The defendant was aware that the United States had designated al Shabaab as a foreign terrorist organization as established by his statement on video in which he acknowledges America's placement of al Shabaab on the list of foreign terrorist organizations.

Third, the nature and circumstances of defendant's lies to the FBI agents, federal prosecutors, and the Chief Judge of the District of Minnesota at his plea colloquy were particularly egregious because the nature of the lies set back the investigation of men within the United States and because the circumstances were that Hassan was working closely with the FBI at the time of the untruthfulness.   Defendant Hassan concealed the

30

identities of people involved in the conspiracy in Somalia and members of the conspiracy in the United States.   Omer Abdi Mohamed is among those who he omitted from his recitation of facts.   He also told the FBI that he had escaped from the al Shabaab training camp following its completion without explaining that he had participated in combat on behalf of al Shabaab against the Ethiopian military.   Defendant Hassan's mendacity was particularly disturbing, given the extraordinary efforts of the FBI to return defendant Hassan to the United States with his family members and constant interaction while defendant Hassan resided in an FBI-furnished residence and assisted the FBI with its investigation.   Finally, the circumstances of the offense include the fact that the defendant had to be confronted with his lies as opposed to confessing to the FBI.

Indeed, the nature and seriousness of the defendant's crimes, including conspiring to provide support to those who seek to kill TFG and Ethiopian soldiers, providing himself to a foreign terrorist organization, and lying to the FBI about the scope of his activities and co-conspirators, weigh strongly in favor of a Guidelines sentence in this case.   *See* 18 U.S.C. § 3553(a)(1) and (a)(2)(A).

**B.      History and Characteristics of Defendant.**

Defendant Hassan's history and characteristics give no indication that he would commit offenses involving killing overseas, joining a foreign terrorist organization, and lying to the FBI.   He testified at trial to having emigrated to the United States in 1996 and moving to Minnesota in 1998.   He maintained employment until leaving the United States and maintained a close relationship with his family, including supporting his

family with his income.   He has no history of abusing drugs or alcohol and has no

criminal history.

To his credit, the defendant quickly accepted responsibility for committing

terrorism offenses. He met with the FBI in Yemen and admitted to joining al Shabaab and

completing a training camp.   He agreed to cooperate with the FBI and returned to the

United States and entered a guilty plea to terrorism offenses under seal in a closed

courtroom.

**C.**   **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The defendant committed extremely serious crimes when he knowingly conspired

to provide material support to al Shabaab.   Considering the seriousness of this crime,

promoting respect for the law and providing just punishment are important factors in this

case.   As the Supreme Court has recognized, "combating terrorism is an urgent objective

of the highest order."   *Holder v. Humanitarian Law Project*, 561 U.S. ___, 130 S.Ct.

2705, 2724 (2010).

Sophisticated terrorist plots, such as those used by al Shabaab to both sustain itself

and commit acts of terror, require multiple participants performing different roles.

Indeed, when enacting § 2339B as a distinct criminal offense, Congress made specific

findings regarding the serious threat posed by international terrorism and the networks that

provide support to those who commit acts of terrorism.   Congress determined, and the

Supreme Court has recognized, that terrorist organizations, such as al Shabaab, "are so

tainted by their criminal conduct that any contribution to such an organization facilitates

32

that conduct." *Humanitarian Law Project*, at 2724 (quoting AEDPA §§ 301(a)(1)-(7), 110 Stat. 1247). The Supreme Court further explained that enforcing § 2339B "furthers this international effort [to combat terrorism] by prohibiting aid for foreign terrorist groups that harm the United States' partners abroad." *Id.* at 2726.

Further, although the defendant has no criminal history and this offense represents his first criminal conviction, his participation in this criminal conspiracy cannot be viewed as a discrete event occurring at a singular place and time.   Far from doing a favor for a friend on a single instance, the defendant repeatedly took steps to provide material support to a conspiracy to kill overseas and to a violent terrorist organization. In fact, the defendant remained an active member of the conspiracy for a year and his participation culminated in his completion of an al Shabaab training camp and an al Shabaab attack captured on video for propaganda purposes.

The government respectfully submits that the Court consider the seriousness of defendant's support to al Shabaab, which has committed numerous acts of terrorism against the government of Somalia, its citizens, and those who have sought to provide relief and comfort to its citizens, including the United Nations and the African Union. A substantial term of imprisonment, therefore, is necessary to reflect the seriousness of defendant's violation of § 2339B and to promote respect for the law.

> ### D.     The Need for the Sentence to Afford Adequate Deterrence to Criminal Conduct, and the Need for the Sentence Imposed to Protect the Public from Future Crimes of This Defendant.

In this case, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing

such a crime again.   General deterrence is the public response necessary to deter other people from committing similar crimes.   "Congress specifically made general deterrence an appropriate consideration   . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)).

Terrorists and terrorist organizations rely upon support from individuals for their success in carrying out specific attacks, as well as their continued existence.   In the District and State of Minnesota, which has seen a proliferation of cases involving young men traveling to join al Shabaab, this is no small interest.   To date, neither the designation of al Shabaab as a foreign terrorist organization nor prosecution of the men who joined al Shabaab and those who have supported them, have completely stemmed the flow of support to the foreign terrorist organization from Minnesota.   The government respectfully requests the Court strongly consider the impact on both this defendant and the broader community when imposing an appropriate sentence.

Further, the harm that material support to international terrorism causes is of grave concern. *Humanitarian Law Project,* 130 S.Ct. at 2724 (upholding the constitutionality of §2339B: "the Government's interest in combating terrorism is an urgent objective of the highest order.").   A substantial sentence is necessary to deter individuals, like the defendant, from leaving the United States to use violence to bring about change in the governments of foreign countries.

A Guidelines sentence in this case would appropriately send a message to the community at large that the United States does not tolerate such abhorrent criminal

34

conduct.   Given the compelling need to deter the continued threat that home-grown terrorists and those that support them pose to the United States and our allies, a Guidelines sentence would send a clear message to any would-be jihadists that such conduct is not tolerated by the U.S. government.   A Guidelines sentence also sends a strong but fair message of deterrence by signaling that those who provide material support to a conspiracy to kill overseas or to foreign terrorist organizations can and will be prosecuted.

      **E.**     **The Kinds of Sentences Available, the Need to Avoid Disparaties and the Sentencing Guidelines and Related Policy Statements.**

Within the last three years, numerous defendants have been sentenced in federal district court for providing, or attempting to provide, material support to a conspiracy to kill, or support to al Shabaab, or related offenses.   At Common Appendix III, the Court will find a short description of each case, the offense(s) of conviction, and the sentence handed down by the respective district courts.

The Guideline sentencing range for the offense to which the defendant pleaded guilty would be life imprisonment but for the limitation provided by the 456-month statutory maximum.   Absent any motion from the government related to the defendant's sentence, the government believes that a Guideline sentence is appropriate and necessary to satisfy the factors described in 18 U.S.C. § 3553(a).

Dated: April 19, 2013                    Respectfully Submitted,

                                         B. TODD JONES
                                         United States Attorney


                                         _____
                                         CHARLES J. KOVATS, JR.
                                         JOHN DOCHERTY
                                         Assistant United States Attorneys


                                         _____
                                         WILLIAM M. NARUS
                                         Trial Attorney
                                         U.S. Department of Justice