UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 09-038  (MJD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **DEFENDANT'S** |
| | ) | **SENTENCING POSITION** |
| v. | ) | |
| | ) | |
| KAMAL SAID HASSAN, | ) | |
| | ) | |
| Defendant. | ) | |

Kamal Said Hassan is twenty-eight years old. Six years ago, his life completely changed. The change was so extreme that he ended up engaged in illegal activity in Somalia in late 2007 and into 2008. And because of his illegal actions, he will appear before your Honor facing a potential 38-year prison sentence.

In the fall of 2007, Mr. Hassan, at age twenty-two, was enticed, funded and helped by others to travel to Somalia to fight Ethiopian troops. He was told it was his duty to fight the Ethiopian troops invading his native country and committing crimes against civilians. By his own choice, he decided to travel to Somalia to fight the Ethiopian troops. In December 2007, he was in Somalia and early the following year he was building a training camp for al-Shabaab. On February 26, 2008, the United States designated al-Shabaab as a terrorist organization. Mr. Hassan trained at the camp, learned to handle a firearm and  participated in an ambush against Ethiopian troops. Right after the ambush, he left Somalia without permission from al-Shabaab. With the help of his family, he

1

escaped to Yemen.

In the meantime, Mr. Hassan's family had been in contact with the FBI. Agents agreed to help his family bring Kamal home. FBI agents, along with Mr. Hassan's brother and an assistant United States Attorney, traveled to Yemen to meet with Kamal. Over the next few days, Mr. Hassan began to tell the agents what he had done from November 2007 through August 2008. It was first day of his cooperation with the United States. The cooperation continues today.

The defendant, Kamal Said Hassan, by and through his attorneys, Manny K. Atwal and Andrew H. Mohring, hereby submits his position with respect to sentencing. Mr. Hassan does not object to the factual assertions found in the PSR, but does object to advisory guideline calculation[1]. The PSR concludes the total offense level is 44, the criminal history category is VI and the advisory guideline range is life. It is Mr. Hassan's position that his total offense level should be 32, his criminal history category I, and his advisory guideline range of 121 to 151 months.[2] Mr. Hassan further requests significant downward departures and variances from the advisory guideline range.

---

[1]See PSR Addendum.

[2] The total offense level comprises of a base offense level of 33, a 2-level enhancement pursuant to 2M5.3(b)(1)(E) (providing self to al-Shabaab), a 2-level enhancement for obstruction of justice, a 2-level reduction for minor role and a 3-level reduction for acceptance of responsibility.

# BACKGROUND

## I.   History of Somalia[3]

The Horn of Africa is the northeastern part of the continent and is generally considered to include Somalia, Ethiopia, Djibouti, Eritrea, and Sudan. Somalia was colonized by the  Europeans during the colonization of the rest of Africa.  The northern part of the country was colonized by the British and the southern portion was colonized by Italy.  In 1960, Somalia achieved independence from both Britain and Italy, and for the first nine years of its independence, was a democracy. However, after the president was assassinated, a military dictatorship was put in place under the rule of General Mohamed Said Barre.

In 1991, General Barre and his regime were pushed out of Mogadishu by a militia known as the United Somali Congress ("U.S.C.") following rebellions across the nation. After chasing General Barre from Mogadishu, the U.S.C. went to war with itself over the control of the government. Since 1991, there has been a great deal of violence and civil strife in all of Somalia. [4]

Somalia has not had a functioning central government since the removal of General Barre.  As a result of years of conflict, Somalia has had a very low rate of

---

[3] Unless otherwise noted, the information was taken from Government's Expert witness Matthew Bryden's trial testimony from United States v. Mahamud Said Omar and United States v. Amina Ali.

[4] It was in 1991, that Mr. Hassan's family fled Somalia and after months of traveling on foot, they found themselves at various refugee camps in Kenya until 1996.

economic development.  In the early 1990s, fighting led to a very serious famine, which was compounded by drought.  The country's roads have always been difficult to travel. Various groups commonly put up unauthorized checkpoints, forcing drivers to pay a fee or face being denied passage.  Although there have been periodic improvements, the economy and food supply of the country has never really recovered to prewar levels. Since 1995, several efforts were made to form a functioning central government. Over the years, several governments were formed outside of Somalia because the situation inside the country was considered so insecure, and that there was no neutral and safe meeting place for delegates to come together.

Between 2000 and 2004, the Transitional National Government was established in neighboring Djibouti.  In 2004, the Transitional Federal Government ("TFG") was formed in Kenya.  The TFG was formed in exile and was not elected by the Somali people, and so in the eyes of many Somalis, it was not a legitimate authority. Nonetheless, TFG was recognized internationally as a valid interim government and was permitted to take Somalia's seats in international organizations like the African Union and the United Nations.  The United States recognized the TFG as an interim authority, though it did not recognize the government officially until recent elections in 2012. To this day, there is no U.S. embassy in Somalia. There is an unfortunate history in Somalia of government corruption and misappropriation.

The TFG is viewed to be no exception to this tradition.   The World Bank estimated in a study that at least $7 of every $10 dollars of Somalia's revenue was being

4

misappropriated by the government. The problems are not limited to economics: there are credible cases of the use of physical torture by TFG agents against Somali people. Efforts to support development of a strong democratic Somalia have been met with resistance from within. In November 2007, President Abdullahi Yusuf condemned the role played by UN agencies, in particular those that provided humanitarian assistance. In the fall of 2007, TFG troops detained the director of the World Food Program. [5]

Sadly, by 2006, history began to repeat itself in Somalia as a group was forming to oust the TFG. Al-Shabaab began organizing and openly opposing the TFG.  By 2007, al-Shabaab had began capturing cities in southern Somalia. At the time the group was not well known internationally. On February 26, 2008, the United States designated al-Shabaab as a Foreign Terrorist Organization. The classification only encouraged leaders of al-Shabaab and soon thereafter they began posting their violence on social media.

## II.    Ethiopia and Somalia

Ethiopia and Somalia have been engaged in a violent conflict for the entire 20th century, leading into the 21st century.  Skirmishes escalated into wars around the turn of the twentieth century, in the 1960s, and again in the late 1970s.  Sometime between 2005 and 2006, a weak and imperiled TFG asked Ethiopian troops for military support. Despite the long acrimonious history between the nations, the TFG initiated an Ethiopian

---

[5] <u>Amnesty International 2008 Report</u>   Routinely Targeted Attacks on Civilians in Somalia.

invasion in order to put down its domestic opposition.  In late 2006, Ethiopia launched an offensive strike that reached the capitol. At the time the capitol was run by the Islamic Courts, a group that opposed the TFG and  was denounced by the United States.  The Ethiopian troops used indiscriminate force, killing noncombatant men, women, and children in neighborhoods unsupportive of the TFG regime.

In response to the Ethiopian invasion,  a large group of Somalis held a series of conferences outside of the country, as they had done decades before,  to try to organize an opposition to the TFG and the Ethiopian troops. Somalis have a strong sense of national identity and loyalty to their country and those strong feelings of nationalism had been greatly stirred by the Ethiopian military invasion. Opposition to the invasion came from outside of Somalia as well.

In 2008, Amnesty International published a report entitled "Routinely Targeted Attacks on Civilians in Somalia." The report recommended that the TFG immediately halt all violations of international human rights and humanitarian law; issue instructions to TFG forces to prohibit arbitrary arrests and detentions, rape and extrajudicial executions. The report recommended the government of Ethiopia halt all violations of international human rights by Ethiopian armed forces in Somalia, suspend any troops who violate such rights and promptly investigate all cases of unlawful killing and rape. Finally, the report recommended that groups opposing TFG and Ethiopian armed forces in Somalia should likewise stop human rights violations and stop unlawful attacks on civilians and distinguish between military targets and civilians. The recommendations were based on

violations by TFG Forces, Ethiopian troops (stealing, slaughtering of civilians in public) and violations by those (al-Shabaab) who opposed the Ethiopian armed forces. Much of the report covers activity in 2006 through 2007. The allegations of human right abuses by Ethiopian troops and the TFG are like those given to Kamal and others in 2007 to encourage them to fight the Ethiopian troops in their native country.

In early 2009, Ethiopia  began to withdraw troops from Somalia while the TFG tried to stabilize the country. In the power vacuum, al-Shabaab was able to take over the capital for a short time. Today, fortunately,  al-Shabaab no longer controls Somalia.  In 2012, Somalia held its first election since 1991. President Hassan Sheikh Mohamud was elected and for the first time in **twenty years**, the United States *officially* recognized Somalia.  Describing the U.S. recognition of Somalia as a "milestone" Hillary Clinton stated "it is not the end of a journey, but it an important milestone towards that end."

### III.    Minnesota Somali Community

Minnesota is believed to be home to some 70,000 people from Somalia. Although they live far away from their native country, Somali politics are discussed and debated widely here. For instance, in 2006 Ethiopian troops took over Mogadishu and soon thereafter, demonstrations took place around Minneapolis. On December 30, 2006, more than a thousand Somalis gathered in  Peavey Park to protest in support of the Islamic Courts. The crowds denounced the entry of Ethiopian troops into their native country. Residents carried signs that read "Ethiopia Out of Somalia." The president of The Somali Institute for Peace and Justice, Hassan Mohamud, organized the protest and yelled "the

7

Islamic Courts are not terrorists!" This is the same rhetoric that was preached to Mr. Hassan and others during their recruitment.

Saeed Fahia, the director of the Confederation of Somali Community in Minnesota, told the Probation Officer that there was much friction over the support of the Islamic Courts Union and the invasion by Ethiopian troops. Ms. Fahia verified that protests were held around Minneapolis over the conflict. (PSR, 87).

In early 2013, newly elected President Mohamud visited the Twin Cities and spoke to an audience over 4000-strong. He promised the crowd he would focus on security, the economy and the judicial system. He urged the audience to help by returning to Somalia or to help from their homes in the United States. [6]

## IV.    Kamal Hassan's Involvement[7]

During the summer of 2007, Kamal Hassan began attending the Abubakar mosque in Minneapolis. It is a mosque that many of his friends from his community college attended. During the month of Ramadan, the holiest month of the Muslim calendar, Kamal began hearing about Ethiopia invading Somalia. There was discussion among various groups about human rights violation (PSR, 35), and protests were widespread in Minneapolis.

Theoretical discussions soon turned into encouragement. Kamal, along with others,

---

[6] Information from http://www.bbc.co.uk/news/world-us-canada-21096483.

[7]Information from Mr. Hassan's trial testimony in United States v. Mahamud Said Omar and the PSR.

was encouraged to go to Somalia and fight for his native country. The group of young men were told by leaders it was their "duty."  They were told to join other Somalis in an attempt to rid the country of Ethiopian troops. The youngsters were told not to discuss the idea with leaders at the mosque or with their families, because they would be discouraged. They began to meet in secret and plans began to emerge to send a young group of men to Somalia. (PSR, 36).

On December 6, 2007, after lying to his parents, Mr. Hassan and Salah Ahmed left Minnesota for Somalia.  During his first month in Somalia, Kamal attempted to return home. His father, Siyad Hassan, was extremely upset that his son was not in Mecca, as he had claimed.  Siyad Hassan went to the mosque, knowing his son had spent much time there, and he demanded to know his son's whereabouts. He threatened to call the police if Kamal was not returned home. Meanwhile, Kamal was in Somalia and was made aware of his father's threats. He asked to go back home, but leaders told him he could not do so. (PSR, 40, 42).

Soon after, Mr. Hassan's passport and personal belongings were taken away from him. The group of travelers from Minnesota were together and were taught more about the conflict in Somalia. They also began to learn more of the group with which they were involved. They began receiving lectures about al-Shabaab and told of a training camp they were expected to attend. Prior to arriving in Somalia, Mr. Hassan and others did not know too much about al-Shabaab. In late 2007, al-Shabaab was not posting videos on social media.

9

The Minneapolis group made their way to the camp site. It was a spot in the jungle and the recruits were divided into groups to build the camp. Within a few weeks of arriving, Salah Ahmed and Abdifatah Isse (two of the Minnesota travelers with Kamal) made an excuse to the camp leaders and were allowed to temporarily leave the camp. They did not return and the entire camp was put on lock-down. Mr. Ahmed wishes he had included Mr. Hassan in the plan to escape, but there was no time and he left as soon as the moment became available. All outside communication was cut-off to the recruits who remained behind. (PSR, 46,47). Armed guards were placed around the camp to make sure no one left the grounds without permission.

Mr. Hassan and other recruits began their training. The training included handling weapons and ambush training. Toward the end of the training a media group came to film the camp. Because Mr. Hassan spoke English, he was asked to read a speech that had been written by a leader at the camp. He was filmed and later Mr. Hassan learned the video appeared on YouTube. After the training, Mr. Hassan and others were sent on a combat mission to fight Ethiopian troops. During the mission, two members of al-Shabaab were killed. No news outlets reported deaths of Ethiopian soldiers.

The combat mission scared Mr. Hassan. Although he never fired his firearm, he recalls being in the dirt terrified he was going to be shot. He crawled on his belly to get out of the ambush. He knew more than ever that he needed to get out of al-Shabaab as soon as possible. After the mission, the group returned to camp. As a reward for his participation Mr. Hassan was given permission to travel without guards. Mr. Hassan left

the camp site and began his efforts to contact his family. With the help of his family and his mother-in-law, he was able to escape from al-Shabaab and Somalia. He traveled to Yemen and was reunited with his family.  Meanwhile in the United States, his family had been in contact with the FBI. The FBI had been in constant contact with Kamal's brother, Mo, and then a meeting was arranged between agents and Kamal's father. Eventually everyone agreed to bring Kamal back home. Mo agreed to travel with agents to setup a meeting between them and Kamal. In Yemen, Kamal and the FBI began the first of many, many meetings. The day marked the beginning of Mr. Hassan's four and a half year cooperation with the FBI and the United States government.

In Yemen, Mr. Hassan met with three FBI Agents and former AUSA Anders Folk. It was the first time Kamal had ever encountered law enforcement and he was scared. He began to tell the agents about how he left Minnesota and ended up in Somalia. He told them a great deal about the training camp and the activities at the camp. Kamal left important things out as well. He did not tell them about participating in combat, a safe house in Marka run by a woman known as Hooya, a leader named Samater and information about Omer Mohamed.[8]

Mr. Hassan, along with his wife and family came home to Minnesota in January 2009. Agents placed Mr. Hassan and his wife in a hotel room in Duluth for weeks. The

---

[8]The PSR in paragraph 69 correctly details the information Mr. Hassan omitted. Inadvertently, paragraph 93 of the PSR incorrectly states that Mr. Hassan omitted information about his co-defendants Ahmed and Isse. Mr. Hassan never left out details about those two co-defendants.

agents stayed across the hall from him. Kamal continued to be debriefed by agents and he stuck with his original story - leaving out the ambush, the Marka home, Hooya and Samater. Mr. Hassan and his wife were moved to the cities and into a house. FBI agents from around the country kept guard at the various homes. Because Mr. Hassan was not in jail, he was able to help law enforcement communicate with others associated with al-Shabaab.  He emailed, made phone calls, wore a wire and was accessible to agents for questioning at all times.  During this time period, every agent counsel spoke to commented on Mr. Hassan's excellent behavior and overall positive attitude.

## THE CHARGES

Mr. Hassan was the first person in this conspiracy to cooperate. He was the first person to admit his guilt in Court. On February 18, 2009, Mr. Hassan pled guilty to a two-count Information charging him with Providing Material Support to Terrorists from November 2007 to August 2008 and Providing Material Support to a Foreign Terrorist Organization from November 2007 to August 2008. After entering pleas of guilty, Mr. Hassan was shown a YouTube video that discussed the ambush. Mr. Hassan admitted to the agents that he had participated in the ambush. He further told agents about the Marka house and the other individuals involved in  al-Shabaab. He explained that he left out details of the ambush because he was afraid of what the agents and the prosecutor would think of him. He was scared that the government would not want to work with him if they knew he had been involved in an ambush. Mr. Hassan also explained that he did not

originally tell them about Samater because Samater was a top official in al-Shabaab with connections in Minnesota (Khalid Abshir's uncle). Mr. Hassan feared for the safety of his family. Similarly, he did not give details about Omar Mohamed because Mr. Mohamed knew Mr. Hassan's family and Kamal feared for their safety.

Based on his omissions, on August 12, 2009, Mr. Hassan entered a plea of guilty to a one-count Supplemental Information charging him with making False Statements on February 9, 2009. The same day, Mr. Hassan agreed to be taken into custody. He did not oppose the government's request for revocation of his release. The government felt that they no longer needed Mr. Hassan to be out of custody to continue his cooperation. During this time, the government agreed to revisit the issue of release at a later date.

On September 7, 2011, Mr. Hassan asked the Court to release him pending sentencing. The Court agreed to his release under very strict conditions. One of the conditions of release was that there be no internet access at the Hassan home. The Hassan family rid themselves of their smart phones and the home internet. Mr. Hassan was also specifically warned not to use the internet. Probation even went to the Hassan home and made sure there were devices installed on the computers that allowed them to monitor attempted internet use.

On the day of Mr. Hassan's release, his younger brother came home from college. He took the laptop from the Hassan house and went to Macy's to log onto the internet to check his fantasy football scores. He was unable to use the internet and attempted to use the internet at another store. Unfortunately, Mr. Hassan's brother did not understand he

couldn't use the laptop and the internet even outside of the home. Counsel verified that the last network that was attempted to be accessed was from Macy's and Savvy Formal Wear. The Court revoked its Order of release before Mr. Hassan ever left. Mr. Hassan was at the Minneapolis Marshal's Office ready to go home, but he was sent back to Sherburne County Jail, where he remains today. Mr. Hassan has been in custody since January of 2009.

## OBJECTIONS TO THE PSR

### I.    Chapter 3 Enhancement: "Victim-Related Adjustment"

The PSR in paragraphs 104, 110 and 115, applies a 12-level enhancement pursuant to § 3A1.4(a). The parties agreed to disagree as to the application of this enhancement. The enhancement is found in the  Victim-Related Adjustments section of the United States Guidelines. The section reads, in part,  as follows:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels...

> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

A "federal crime of terrorism" is defined in 18 U.S.C. § 2332b(g)(5). A federal crime of terrorism is one that "(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a violation of [a list of predicate offenses, including § 2339A and B]." 18 U.S.C. §

14

2332b(g)(5). The "calculation" element of a federal crime of terrorism requires proof that the defendant possessed the "specific intent ... to commit an offense that was calculated to influence" government conduct. United States v. Awan, 607 F.3d 306, 317 (2d Cir.2010) (internal quotation marks and citation omitted). As such, to impose the terrorism enhancement, the court must find that Mr. Hassan committed (a) an enumerated offense, (b) with specific intent to influence government conduct. In other words, did Mr. Hassan provide material support with the intent to influence government conduct?

### A.    The Enhancement Should not Apply to Mr. Hassan.

Mr. Hassan has admitted to an enumerated offense and admitted he provided material support to a terrorist organization but does not agree the enhancement applies. He supplied himself to al-Shabaab to rid Somalia of the Ethiopian troops. It is unclear which "government" could trigger the application of the enhancement. In this case, is it the Ethiopian government or the Somali government? Further, because this enhancement is considered a victim-related enhancement, is the "victim" the unwelcome Ethiopian troops, the embattled Somali civilians, or their governments? The PSR concludes that the victims have not been identified. (PSR, 85).

Mr. Hassan's motive for providing himself to al-Shabaab was to assist in removing Ethiopian troops from Somalia. He did not think about who the ruling government would be in  Somalia and had no intent of influencing the power structure in his native country. As such, Mr. Hassan argues that the enhancement should not apply because his intent was

never to influence "government conduct."

**B.      The Rationale Behind the Enhancement.**

The rationale behind the § 3A1.4  enhancement is to prevent recidivism. Terrorism

defendants "with no prior criminal behavior are unique among criminals in the likelihood

of recidivism, the difficulty of rehabilitation, and the need for incapacitation." United

States v. Stewart, 590 F.3d 93, 143 (2nd Cir. 2009), citing United States v. Meskini, 319

F.3d 88, 92 (2d Cir.), cert. denied, 538 U.S. 1068, 123 S.Ct. 2240 (2003). In the Violent

Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322 (1994), and the

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132,

Congress directed the Sentencing Commission to amend the guidelines to provide an

appropriate enhancement for any felony that involves a Federal crime of terrorism.

In contrast to the concerns which motivated the enhancements, Kamal Hassan is

unlikely to be a recidivist of any kind of crime including terrorism.  His true criminal

history category is I. This is true because of his lack of a criminal history. Mr. Hassan was

twenty-two years old when he committed this offense. Today, he is six years older.

Today, he is married and is a father. Today, he is a man that has shown real remorse for

his actions by cooperating with the government. He left al-Shabaab on his own accord.

He left behind criminal activity by his choice.  His behavior since escaping al-Shabaab is

a factor that shows he is unlikely to commit any type of crime in the future. He never

attempted to run from the FBI or commit new crimes while in Yemen, or during his travel

16

back to the United States, or while staying at various houses in Minnesota under the guard of the FBI. His continuing cooperation is another factor that shows he is unlikely to commit a future crime of terrorism.

Plainly put, Mr. Hassan's acceptance of responsibility and cooperation with the government and other countries reflects a reduced likelihood of recidivism and further offending.  His post offense rehabilitation should not be ignored. His post offense rehabilitation  supports that he will not fail at continued rehabilitation. These realties weigh against the concerns of re-offending that motivate the enhancement.

## II.     Role Adjustment[2]

The PSR in paragraphs 69, 105 and 111, recommends against a minor role reduction for Mr. Hassan. The potential reduction was a matter left open in the plea agreement. Mr. Hassan maintains his role in this conspiracy was minor compared to others charged and uncharged in this conspiracy and therefore, a minor role reduction is appropriate.

Guideline §3B1.2(b),  Application Note 5,  states that this provision applies to a defendant "who is less culpable than most other participants, but whose role could not be described as minimal."  The definition of 'minor participant' contained in this Note was adopted  by the Eighth Circuit in United States v. West, 942 F.2d 528, 531 (8th Cir. 1991),

---

[9] Mr. Hassan agrees there were defendants less involved than he. As such, he is requesting a minor role adjustment rather than a minimal role adjustment.

where the court defined a minor participant exactly as the Note does.   Further, Application Note 3(A) to U.S.S.G. §3B1.2 provides that the adjustment is to be applied to a defendant who "plays a part in committing the offense that makes him substantially less culpable than the average participant."

In this case, Mr. Hassan was recruited by others to travel to Somalia. While in Somalia, he was under the constant authority of leaders. He did not hold a position of power or even that of someone who had freedom and independence. He took orders from those higher than him. He was a foot solider. There was a hierarchy in both Minnesota and Somalia. Even in Minnesota, before his departure, he was a follower, a recruit. His participation in the meetings leading up to his departure were organized by others. He attended the meetings as a participant.  He did not pay for his airline ticket, he did not come up with fake airline tickets to show his father and he did not come up with the lie to tell his father. When he arrived in Somalia, he participated in the conspiracy by receiving training from others, building the camp at the direction of others and participating in an ambush against Ethiopian troops as ordered by the men who controlled the camp. His personal identification and his cellular phone were taken away. He could not go home. After others escaped, the camp was guarded by armed men and he was watched. Clearly, Mr. Hassan was less culpable than others involved with al-Shabaab.

However, the analysis does not stop at Mr. Hassan's culpability. Even a defendant who is decidedly less culpable than his co-defendants, may not be entitled to the minor

participant reduction if he is deeply involved in the criminal acts. United States v. Alverez, 235 F.3d 1086, 1090 (8th Cir.2000). Mr. Hassan was not deeply involved in the criminal acts.  Mr. Hassan's criminal act was lending support to a foreign terrorist organization. He helped build a training camp, trained in weapons handling, and participated in an ambush. He was not the group leader or one of the individuals that organized criminal activity. He never gave orders, planned activities or recruited others. He did not have full knowledge of the plans or activities of al-Shabaab.

In United States v. Sanchez, 25 Fed. Appx. 476, 476 (8th Cir. 2001), the Court affirmed the defendant's two level sentence reduction when the lower court found he played a minor role in the distribution of methamphetamine.  This finding was affirmed despite the fact the defendant was part of the advanced planning and used his cellular phone in the conspiracy to communicate information central to the conspiracy. Also, the defendant confessed to his understanding of the scope and structure of the conspiracy to distribute methamphetamine. The Court found that although he was aware of the crime, his role was sill minor in furthering it.  Similarly, Mr. Hassan plainly understood one of the goals of al-Shabaab: to remove Ethiopian troops from Somalia. However, unlike even the defendant in Sanchez,  he never knew the full scope and structure of the organization, nor its growing mission.. He was never part of the advanced planning and never played even close to a central role in the conspiracy. His role was that of a foot solider. His role is minor.

Based on the fact, respectfully, Mr. Hassan requests that the Court apply a two-level reduction for his role in this conspiracy.

## III.   Term of Supervised Released

The PSR concludes the term of supervised release for Counts 1 and 2 of the Information is life. The plea agreement between the parties suggests that the term of supervised release is 3 years.[10] As such, an objection was made to the PSR. However, upon reviewing 18 U.S.C. § 3583(j), a life time term of supervised release is permitted if the defendant is convicted of 18 U.S.C. §§ 2339A and 2339B. Mr. Hassan has admitted guilt to both statutes and therefore concedes the propriety of lifetime supervision.

## DOWNWARD DEPARTURE GROUNDS

## I.   Overstated Criminal History[11]

Prior to this offense, Mr. Hassan has never been in trouble with the law. He has no juvenile adjudications or adult convictions. (PSR, Part B). However, pursuant to §3A1.4(b), if the offense was intended to promote a federal crime of terrorism, the defendant's criminal history is catapulted to VI. A judge determining that § 3A1.4(b) over-represents "the seriousness of the defendant's past criminal conduct or the likelihood

---

[10] Plea Agreement from February 18, 2009, paragraphs 4 and 6(j).

[11] Mr. Hassan makes this argument only if the Court applies the 12-level enhancement pursuant to 3A1.4(a). If the enhancement applies, the criminal history category is VI. If the enhancement is not applied, Mr. Hassan's criminal history is category I.

that the defendant will commit other crimes" always has the discretion under § 4A1.3 to depart downward in sentencing. U.S.S.G. § 4A1.3.  United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003).

Mr. Hassan's criminal history category is plainly overstated by his placement in category VI. He has shown that he is not a danger to the community by turning to the FBI for help, assisting the FBI and continuing to assist the United States government. When Mr. Hassan first met with the agents in Yemen, he was allowed to leave at the end of the interviews. He did not run and he did not commit new offenses. During the first eight months of his prosecution, he stayed in various homes under the supervision of FBI agents. Again, he did not commit crimes or place anyone in harms way. Since being at Sherburne County, his behavior has been excellent. He has not had a single rules violation. Rather, he was given extra duties as a trustee due to his conduct. This behavior shows he does not belong in a criminal history category VI and he respectfully requests a downward departure pursuant to §4A1.3(b).

## II.    Cooperation

Mr. Hassan's cooperation in this case is beyond extraordinary. He was the first person in this conspiracy to cooperate. He has been debriefed from countless government organizations on dozens and dozens of occasions. His early cooperation included monitored phone calls, recorded in-person conversations, proffers, identifications and trial testimony. Some of his cooperation took place without counsel. In others words, Mr.

21

Hassan has met with agents whenever they need him, regardless of his counsel's availability. Mr. Hassan has cooperated to show his true remorse. Even when the government requested he be taken into custody in August 2008, Mr. Hassan continued to cooperate. Last year when the government opposed his release, they openly stated that Mr. Hassan needed to remain in custody. Despite his sadness over the government's statements, Mr. Hassan did not stop cooperating with them. The details and the extent of Mr. Hassan's cooperation will be discussed in a separate memorandum to the Court. Mr. Hassan should be granted a **very significant** downward departure pursuant to §5K1.1 because of his cooperation.

## DOWNWARD VARIANCE

I.    **Duress and Coercion**[12]

How could a young man who played basketball for his high school, went to Mexico with friends for spring break, has a very supportive family, go from being a "normal" young man to flying halfway across the world to a country he left behind in 1991? It is a question this Court asked Kamal when he testified for the government. His answer has always been the same. He left because he was told it was his "duty" to help his native country.

The  Transitional Federal Government ("TFG") and tactics of the invading

---

[12] Recognizing there is a traditional departure pursuant to § 5K2.12 (Coercion and Duress), Mr. Hassan does not make a departure motion, but rather requests the Court consider these factors when determining a variance.

Ethiopian army supporting the TFG triggered a nationalistic response from many members of the Somali diaspora. As previously stated, Minneapolis was a hotbed for protests. Kamal, along with other young men from Minnesota were swept into this patriotic fervor and traveled to Somalia to fight the Ethiopian troops.  Resistance to the Transitional Federal Government was loosely unified.  The result was that many armed resistors fought with groups that did not actually represent their views beyond a mutual distaste for the Ethiopian invaders.

Somalia is a clan-based society.[13]  Somalis strongly identify as members of their clan and members of the state of Somalia.[14]  In 2007, the TFG was somewhat recognized as the legitimate government of Somalia by members of the international community, including the United States.  (Official recognition from the United States came in 2012.) However, this recognition did not reflect the reality that the TFG was a non-representative, undemocratic, unpopular, and repressive government. The TFG represented the interests of a small number of Somali clans, not the broader Somali population.[15]  The TFG was fundamentally undemocratic because it excluded the majority of Somali clans from the governing process.  Despite pleas and attempts to share power, the small number of clans who dominated the Transitional Federal Government

---

[13] Trial Transcript of Testimony of Matthew Bryden, United States v. Omar, page 125.

[14] Id. at 120.

[15] Id. at 125, 131.

23

maintained a tight grip on the government apparatus.[16]

Furthermore, the Transitional Federal Government was unable, and in some cases unwilling, to perform the basic functions of a government.  Somali citizens could not look toward the TFG for "protection or social security."[17]  In fact, as previously stated, there were credible cases of the TFG using torture against Somali citizens.  The undemocratic and deficient nature of the transitional government led to "[h]uge groups of legitimate people want[ing] to get rid of the Transitional Federal Government."[18]

In response to the Somali population's unhappiness with the TFG, the TFG invited the Ethiopian military to help maintain its exclusive grip on power. The Ethiopian military used brutal tactics against clans not aligned with the Transitional Federal Government, including killing or injuring noncombatant women, children, and men.[19] These brutal tactics were used by a foreign military force to prop up an undemocratic and repressive government.

 Early attempts at recruiting Kamal and others centered around telling him about the Ethiopian invasion and the negative impact of that invasion on Somali civilians. For example, he was told Somali women were being raped.  He was told it was his duty as a

---

[16]*Id.* at 129 (Noting that the Transitional Federal government "never ended up sharing power.").

[17]*Id.* at 125.

[18]*Id.* at 132-33.

[19]*Id.* at 127.

Somali to go.  At trial, Mr. Hassan  stated "what convinced me to go was when he [a recruiter] started talking about the Ethiopians killing *our people* . . . in Somalia (emphasis added)."[20]  Kamal's national identity as a Somali was clearly implicated by the Ethiopian invasion and he was motivated and enticed to defend Somalia.

This motive is consistent with the analysis of Matthew Bryden, the government's expert witness on current Somali events. Mr. Bryden described Somali national identity as strong and impacted by current events in Somali.[21] Frankly, Mr. Hassan's response to a foreign attack on his homeland is not unique either.  U.S. military recruiters noted that 9/11 drastically influenced people to enlist in the military.[22]  Individuals who would not have otherwise joined, signed up for the "sole purpose of defending America."[23]

Mr. Hassan's long history of remaining relatively uninterested in Somali affairs and the drastic change following the Ethiopian invasion suggest he, like many Americans following 9/11, had a sense of national identity stirred by the assault on his native country.  Similarly, Mr. Hassan expressed that sense of national identity by taking up arms to defend his homeland was encouraged by his recruiters.

---

[20]*Id.* at 5, 8

[21]Trial Transcript of Testimony of Matthew Bryden at 130, United States v. Omar,

[22]Lisa Daniels, *Recruiters Recall Patriotism of Post 9/11 America*, U.S. Department of Defense, Sept. 8, 2011, http://www.defense.gov/news/newsarticle.aspx?id=65272.

[23]*Id.*

## II.     Motivation Was Not Based On Religious Extremism

The resistance to the Transitional Federal Government was not unified.  It was largely made of clans that had been excluded from power.[24]  The result was an "amorphous opposition[25]" with "a lot of actors fighting for a lot of different reasons."[26] There were few, if any, unifying factors among the resistance groups beyond a distaste for the Transitional Federal Government and the opposition to the Ethiopian military.

Al-Shabaab was one of the groups that emerged in armed resistance to the Transitional Federal Government.  In addition to being anti-TFG, al-Shabaab also preached a form of religious extremism.  However, a closer look at al-Shabaab membership shows that the vast majority of al-Shabaab fighters in the early years did not identify with al-Shabaab religious extremism.  Matthew Bryden estimated that there were about 2500-3000 individuals who participated in al-Shabaab training and orientation and estimates of 7000-8000 people willing to fight with al-Shabaab.[27]  However, he estimated that there were only several hundred committed ideologues within al-Shabaab.[28]  This discrepancy between the individuals willing to fight for Somalia and the committed

---

[24]Transcript of Testimony of Matthew Bryden at 126, United States v. Omar, CR-09-242 (2012).

[25]*Id.* at 134.

[26]*Id.* at 134.

[27]*Id.* at 134.

[28]*Id.* at 134.

ideologues demonstrate that al-Shabaab's chief appeal was not its religious message for Mr. Hassan and those like him.  Instead, al-Shabaab functioned as a means to the end for individuals who wished to take up arms against the Ethiopian military for other reasons.

Mr. Hassan joined with al-Shabaab entirely because he identified with its nationalistic message and not its religious message.  Kamal had no history of religious extremism and his statements prior to leaving indicate a patriotic motive for returning to Somalia. He wanted to stop Ethiopian troops from hurting civilians in Somalia. Mr. Hassan's exit from al-Shabaab and his subsequent cooperation demonstrate he was not one of the committed religious ideologues of the group.  As he learned about their true mission, he fled from al-Shabaab. His subsequent cooperation with the FBI and the United States demonstrates he was not one of the committed religious ideologist.

III.    **Voluntary Withdrawal from the Conspiracy.**

Although enticed to go to Somalia to fight Ethiopian troops, Mr. Hassan admittedly chose to travel to Somalia, train at a camp and participate in an ambush. However, he  also chose to leave al-Shabaab. He left soon after the ambush, because he learned that he wanted nothing to do with al-Shabaab or any organization that involved shooting or killing. He left without permission. His withdrawal from al-Shabaab and subsequent voluntary cooperation of with the FBI should be considered by the Court as a positive factor.

**3553(a) FACTORS**

In order to determine a reasonable sentence, the Court should apply the factors outlined in 18 U.S.C. 3553(a). Some of these factors are discussed below:

*The nature and circumstances of the offense*.

The nature and circumstances of this offense have been discussed throughout this position pleading and do not require repetition here. Mr. Hassan has admitted over and over again that he provided material support to a terrorist organization and lied to the FBI on February 9, 2009. Since then, there is no indication he has been dishonest. The United States government and foreign governments have relied on Mr. Hassan's information and continue to request his cooperation.

*The history and characteristics of the defendant*.

Part C of the PSR details Mr. Hassan's background and it will not be repeated in full here. As the court is aware, Mr. Hassan came to the United States with his family in 1996. The Hassan family has always worked hard to support each other. Kamal began working at age 16 to contribute to the household. After graduation from high school, he began attending community college. While in college, he continued to work with his father to support the family.

The family was in extreme shock when the learned that Kamal was in Somalia and not in Mecca. They have never been very religious and could not understand why Kamal lied to them and left his home. It is clear from the statements his family made to the Court

28

at the time of his detention hearing and to the Probation Officer (PSR, 137-139), that Mr. Hassan's family remains supportive of Kamal. They are thankful that the FBI helped them bring Kamal home safely. They are hoping that Kamal can be reunited with his wife and his son.

In a separate filing, Kamal wishes to address the Court himself via a letter.

**_Behavior since January 1009_**.

Despite his mistakes, not one person of authority has complained about Mr. Hassan's behavior since he has been in Federal custody. As previously stated, agents from all around the United States took turns living with Mr. Hassan and his wife. They communicated with Mr. Hassan, drank tea together and sometimes took trips outside the home. He has been at the Sherburne County Jail since 2009. Almost every guard knows Kamal. Last year, when he was scheduled to be released, guards came by to say goodbye to him. He was made a trustee and given extra duties and freedoms. In the four years he has been at the jail, he has not received a single complaint. He has met with agents at the jail without counsel. As he stated at trial, he has been allowed to meet with his family at the FBI, and again there have been no problems. Six years ago, when Mr. Hassan made the decision to fight Ethiopians in Somalia, he was young and lost. Today, he is a father. He is a married man. Kamal feels a tremendous amount of guilt about what he has done to his family. His parents have separated. His family lost their restaurant and their home in early 2008. He never thought through the consequences of

his actions on those he loves. Clearly, sitting in jail for over four years, not being able to

raise his son, and seeing the continuing pain he is causing his family, has taught him

much.

### Deterrence.

There are still young men from Minnesota who are in Somalia. Kamal Hassan

made the choice to contact the FBI and seek their help. In return, he helped them and

continues to help to this day. Hopefully, the still missing young men can see that there is

help for them and they can be reunited with their families. The prosecution of this case

alone has served as a deterrent. His cooperation, his public rehabilitation and the years he

has served in jail will serve as a strong deterrent to other young men not to follow al-

Shabaab. A longer time in prison is not necessary to send that message.

### Protecting the Public.

Two years ago, 60 Minutes interviewed Maajid Nawaz. Mr. Nawaz, a British

citizen, was once a member of a Muslim extremist group. He supported al Qaeda. He

rejoiced during 9/11. He became the leader of Hizb ut-Tahrir, England's most active

Islamic extremist groups. [29] He traveled to Egypt soon after 9/11 and was arrested for his

Islamic radical beliefs. During his trial, he shouted radical comments and refused to

cooperate with the proceedings. He was sentenced to five years in prison. He was placed

in a prison with leaders from the Muslim Brotherhood and the assassins of the former

---

[29] http://www.cbsnews.com/2102-18560_162-6698363.html

President of Egypt Anwar Sadat. Mr. Nawaz was excited to be in prison with such "respected" leaders. He was shocked to learn that the leaders had long left behind their jihadist views. Mr. Nawaz tried to convert the leaders back to jihadist views. It did not work and instead, he began to learn his views were simply wrong.

After leaving the Egyptian prison, Mr. Nawaz was a new man. He returned to England. His very religious family, his wife and his friends left him because of his new life. Today, Mr. Nawaz travels around the world lecturing on the wrongs of extremist beliefs, caliphates, and Sharia law. Mr. Nawaz has completely changed his 13-years of extremist thinking and now is converting "terrorists" into law abiding citizens. Mr. Nawaz's story shows that people, even the "terrorist" of which we are all so understandably afraid, can change.

Kamal Hassan, who was never motivated by religion but by nationalism, has shown he too has changed. For ten months, from November 2007 to August 2008, he was influenced to join the extremist, but his time, and not his behavior since, was truly out of character.  Like Mr. Nawaz, Mr. Hassan is no danger to the public. He has demonstrated his commitment to this country and its laws and protection time and time again since 2009.

### *Advisory Sentencing Ranges.*

Mr. Hassan pled guilty to two  Class C felonies and a class D felony. The PSR sets Mr. Hassan's advisory guideline range at life. Counts 1 and 2 of the Information from

February 2009, carry a maximum sentence of 15-years. Count 3 of the Supplemental Information carries a maximum sentence of 8-years. As such, the advisory guideline range becomes 456-months. If the Court does not apply the 12-level enhancement, applies a two-level reduction for his minor role and places Mr. Hassan in criminal history category I because he has no prior criminal history, his advisory guideline range is instead 121-151 months. (Total offense level of 32).

Mr. Hassan has been "in-custody" one way or another since January 2009. As stated by the government at his release hearing on March 28, 2011, Mr. Hassan was in the custody of the FBI beginning in January 2009 and ending in August 2009. He was not free to leave. At the time of the hearing, the government agreed that Mr. Hassan should receive credit for the seven months he was in a custodial environment, though not in jail.[30]

### *Avoiding unwarranted sentence disparities.*

It is difficult to compare Mr. Hassan with others charged or found guilty of similar conduct. In part the analysis is challenging because not many individuals have been convicted of such offenses. Comparison is made even more difficult because as far as counsel is aware, nobody has cooperated to the level Mr. Hassan has cooperated in similar cases. Despite the imperfection of Comparison, a review of the cases of a handful of defendants charged with similar crimes can be instructive.

Daniel Maldonado: In February 2007, Mr. Maldonado was charged in federal

---

[30]Detention Hearing Transcript form March 28, 2011, page 36.

court in Houston, Texas with providing material support to al-Shabaab. He was the first American charged with such a crime in the United States. He was sentenced to 10-years in prison followed by 3-years of supervised release. He admitted to joining al-Shabaab, receiving military training, including bomb-making and interrogation techniques. He further admitted to being a religious fundamentalist and stated he was willing to act as a suicide bomber.

Christopher Paul: On February 26, 2009, Mr. Paul, was sentenced to twenty years in Columbus, Ohio. He admitted to conspire with others to use a weapon of mass destruction against targets in the United States and Europe. He admitted to receiving training by al Qaeda in Afghanistan, and then fighting there as well. Mr. Paul then returned to the United States and began recruiting others to join al Qaeda. He assisted terror cells in Germany by training, sending money and buying equipment.[31]

Abdow Abdow: Mr. Abdow admitted to obstructing justice related to the instant case. He was sentenced to 120-days imprisonment followed by 3-years of supervised released. (PSR, 18).

Europe has seen more sentences for defendants charged with similar and more serious terrorist related charges. Recently, Richard Dart was sent to prison for six years for conspiring to commit terrorist acts in the weeks before the London Olympic Games. Dart's co-defendants were sentenced to four years and nine years respectively. One of the

---

[31] http://www.justice.gov/opa/pr/2009/February/09-nsd-171.html

33

men had received training at a camp in Pakistan. The defendants refused to stand up in court and continued with extremist views throughout the case and in court[32].

In another ongoing prosecution in the United Kingdom, a British national who possibly trained at two training camps and participated in an ambush in Somalia. Defense counsel was advised of this investigation when Mr. Hassan recently met with the foreign agents. Counsel was made aware that the suspect, a non-cooperator, will most likely receive a term of imprisonment of five years.

None of these cases are similar to Mr. Hassan in terms of his less involvement, his voluntary withdrawal, his extraordinary cooperation or even his lace of extremist views. However, the cases to provide some guidance.

When applying the above factors, it does become clear, that a **significant** downward variance from the advisory guidelines is justified and reasonable.

## CONCLUSION

Counsel for Kamal Said Hassan respectfully request a significant downward departure and variance from the advisory guidelines. For four and half years, counsel has been at Mr. Hassan's side and has seen him become a father, a better son, a husband and a better citizen of this county. He can not take back the choices he made in 2007. He can change his future and he has been doing that since January 2009. He has done everything

---

[32]

http://www.ibtimes.co.uk/articles/461255/20130425/british-muslim-convert-richard-dart-given-six.htm)

possible to show his regret and remorse for his actions. Four and a half years of his life have been spent with FBI agents, government lawyers and law enforcement agents from around the world. He has never complained. He has never expressed anger. He has never raised his voice. Rather, he continues to express his sadness over his actions. He has hurt his family beyond belief. He has hurt his community in Minnesota.

Imposing a sentence that is sufficient but not longer than necessary is left to this Court's discretion. Kamal Hassan's level of cooperation is completely extraordinary. His four and a half years of being in custody, his withdrawal from the conspiracy, his motive for traveling to Somalia and committing a crime while there, his age at the time of the offenses, his family support and the man he is today, are important factors Kamal Hassan request that the Court consider.

Dated: May 2, 2013

Respectfully submitted,

*s/Manny K. Atwal*
MANNY K. ATWAL
Attorney ID No. 0282029
ANDREW H. MOHRING
Attorneys for Defendant
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

35