```
                   UNITED STATES DISTRICT COURT
                      DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )
                              )
    United States of America,  )   File No. CR-09-38
                              )            (MJD)
            Plaintiff,         )
                              )
    vs.                        )   Minneapolis, Minnesota
                              )   May 13, 2013
    Kamal Said Hassan,         )   1:35 p.m.
                              )
            Defendant.         )
                              )
                              )
------------------------------------------------------------
```

BEFORE THE HONORABLE MICHAEL J. DAVIS
UNITED STATES DISTRICT COURT JUDGE

**(SENTENCING HEARING)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

LORI A. SIMPSON, RMR-CRR
(612) 664-5104

```
 1      APPEARANCES
         For the Plaintiff:        U.S. Attorney's Office
 2                                 CHARLES J. KOVATS, JR., AUSA
                                   LEEANN K. BELL, AUSA
 3                                 600 U.S. Courthouse
                                   300 South Fourth Street
 4                                 Minneapolis, Minnesota 55415

 5                                 U.S. Attorney's Office
                                   JOHN DOCHERTY, AUSA
 6                                 Suite 404
                                   316 North Robert Street
 7                                 St. Paul, Minnesota 55101

 8                                 U.S. Department of Justice
                                   WILLIAM M. NARUS, ESQ.
 9                                 Room 1746
                                   950 Pennsylvania Avenue NW
10                                 Washington, D.C. 20530

11       For the Defendant:        Office of the Federal Defender
                                   MANVIR K. ATWAL, ESQ.
12                                 ANDREW H. MOHRING, ESQ.
                                   107 U.S. Courthouse
13                                 300 South Fourth Street
                                   Minneapolis, Minnesota 55415
14
         Court Reporter:           LORI A. SIMPSON, RMR-CRR
15                                 1005 U.S. Courthouse
                                   300 South Fourth Street
16                                 Minneapolis, Minnesota 55415

17

18

19

20

21

22

23

24

25
```

3

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3          THE COURT:  Let's call this matter.

4          THE CLERK:  The United States of America vs. Kamal

5    Said Hassan, Criminal Case No. 09-CR-38.  Counsel, will you

6    please state your appearances for the record.

7          MR. NARUS:  Good afternoon, Your Honor.  On behalf

8    of the United States we have Assistant U.S. Attorneys John

9    Docherty, LeeAnn Bell, and Charles Kovats, along with

10   Special Agent Pat Rielly of the FBI.  I am William Narus

11   from the Department of Justice.

12         THE COURT:  Good afternoon.

13         MS. ATWAL:  Good afternoon, Your Honor.  Manny

14   Atwal and Andrew Mohring on behalf of Kamal Said Hassan, who

15   is standing next to me.

16         THE COURT:  Good afternoon.  All right.  Let's

17   step forward.

18         MS. ATWAL:  Your Honor, that's Kamal's son.  I

19   apologize.

20         THE COURT:  Why don't you get him back in so the

21   family members can be here.

22      (Pause.)

23         THE COURT:  Counsel, have you had an opportunity

24   to read and review the presentence investigation report in

25   this matter?

1              MS. ATWAL:  We have, Your Honor.

2              MR. NARUS:  We have, Your Honor.

3              THE COURT:  Any objections to the factual

4      statements contained in the presentence investigation

5      report?

6              MS. ATWAL:  Not as to the factual, Your Honor.

7              MR. NARUS:  No, not as to the facts, Your Honor.

8              THE COURT:  The Court will adopt the factual

9      statements contained in the presentence investigation report

10     as its own.

11             Counsel, you have objections to the advisory

12     guideline calculations?

13             MS. ATWAL:  I do, Your Honor.  The first objection

14     relates to the 12-level enhancement for what's called the

15     victim related enhancement and the second one is to minor

16     role and the third one is to the supervised release.

17             Beginning first with the 12-level enhancement,

18     which calls for if there's a terrorism related act that's

19     intended to influence a government, the base offense level,

20     which is already at 33, is enhanced 12 levels and somebody

21     who has a Criminal History Category I, II, or III, and in

22     this case Kamal has a criminal history category of I,

23     they're automatically moved to Criminal History Category VI.

24             Recognizing some of the case law that has come out

25     of the Second Circuit and the Sixth Circuit and the Eighth

1    Circuit has yet to rule, I respectfully disagree with the

2    enhancement that's included in the PSR and is argued by the

3    government.

4            First as to the 12-level enhancement that is added

5    on, not even talking about the criminal history category,

6    the question for the Court is did Kamal Hassan's actions,

7    that is, providing himself to al-Shabaab in Somalia, was

8    that intended to influence the government.

9            What the guidelines don't make clear is what

10   government.  Is it the government of Ethiopia?  And that is

11   because Kamal Hassan went to Somalia to fight Ethiopian

12   troops, to remove Ethiopians from the country of Somalia.

13   Or do the guidelines refer to government as in the

14   government of Somalia?  Or do the guidelines refer to the

15   government as the United States?  Which we have

16   jurisdiction -- this country is the one that has

17   jurisdiction because the acts began here in Minnesota.

18           Because of, first of all, the vagueness of what

19   "government" means and what the influence of government

20   actually --

21           THE COURT:  Is there really vagueness dealing with

22   what the government is?  Isn't this just being -- because

23   the Eighth Circuit hasn't ruled on it, but the other

24   circuits have certainly ruled on it and shouldn't I follow

25   those interpretations, which make sense?

1           MS. ATWAL:  Your Honor, in the case law that has

2      come out there's one case, I believe, that talked about

3      whether folks in the U.S. were trying to influence the

4      Colombian government.  So I believe in that case they said,

5      look, even if it's a government of a foreign country, such

6      as Colombia, this enhancement can apply.  But that was just

7      one case.  The other cases it's always something related to

8      the United States.

9           And I understand that, yes, "government" can mean

10     many things.  Like I said, it could be the government of

11     Somalia or the government of the U.S.  I'm arguing that it

12     is vague and shouldn't apply in this case.

13          The second part --

14          THE COURT:  Are you saying that if al-Shabaab, who

15     has made a statement that they're going to take Islam to

16     Jerusalem, that if they started attacking Israel, that

17     Israel would not be a government because Israel is not

18     acknowledged as a government by the vast majority of the

19     Muslim countries in this world?

20          MS. ATWAL:  Certainly not, Your Honor.  I mean,

21     that would be absolutely -- if there was some hook with some

22     jurisdiction with the federal government of the United

23     States and that somehow was influencing --

24          THE COURT:  Well, wasn't the Transitional

25     Government of Somalia the government for Somalia?

1          MS. ATWAL:  At the time it was recognized by the

2    United States as a government.  It wasn't officially

3    recognized, the Somalia government has never been officially

4    recognized until recently, in January 2012, when Hillary

5    Clinton and the newly-elected president met and said, okay,

6    we are going to officially recognize you.

7          I agree -- Matthew Bryden, who is the government

8    for the -- expert for the United States, said at trial the

9    Transitional Federal Government was recognized by Western

10   countries such as the United States, but it wasn't

11   officially in place.

12         As we know, the history of Somalia has always been

13   in the past 20 years --

14         THE COURT:  If it's recognized by the United

15   States, isn't that all we need here?

16         MS. ATWAL:  No, I respectfully disagree.

17         THE COURT:  Are you saying that as a district

18   court judge I'm supposed to determine when it is in place?

19         MS. ATWAL:  No, Your Honor.  What I'm asking the

20   Court to do is to look at the guideline -- the advisory

21   guideline enhancement that does say if it's -- for an

22   offense that Kamal Hassan has pled guilty to, did that act

23   intend to influence a government or the government.  And

24   what I am asking the Court to say is what --

25         THE COURT:  Well, government would be the

1   Transitional Government.

2          MS. ATWAL:  And, again, what I'm going to argue to

3   the Court and respectfully put on the record is that that's

4   vague, "the government."  Whether Somalia --

5          THE COURT:  This is argument and I can ask

6   questions.

7          MS. ATWAL:  Absolutely, Your Honor.

8          THE COURT:  If you just want to make a statement,

9   that's one thing, but I'm trying to understand your

10  position.

11         MS. ATWAL:  Your Honor, my position is and what I

12  argue to the Court is that the Court should adopt that that

13  guideline enhancement and a victim related offense, when it

14  speaks of the government, it's vague as to what is the

15  government, whether it is the government of Ethiopia,

16  removing their troops, or --

17         THE COURT:  I don't understand.  You say that if

18  al-Shabaab marched to Jerusalem, that it would be a

19  different situation with Israel.  I don't understand that

20  because since 1947 Israel has not been recognized by the

21  Arab countries as being a country.  Although it's been

22  recognized by the Western countries, it certainly hasn't

23  been by Islamic countries, even the ones that are right next

24  to it.

25         And so with that, whether or not Hamas,

1   al-Shabaab, or any other terrorist group that the

2   government has -- United States government has designated as

3   a terrorist group, you're saying that they could do whatever

4   harm they would want to do and I or the court would not have

5   jurisdiction to use the terrorism enhancement.

6          MS. ATWAL:  That's certainly not what I'm arguing

7   here, Judge.  What I'm saying to the Court is and what my

8   argument to you is --

9          THE COURT:  Well, let's do it step by step.

10         MS. ATWAL:  Okay.

11         THE COURT:  If you say that it's a question mark

12  dealing with what a government is, why is Somalia and the

13  Transitional Government any different than Israel?

14         MS. ATWAL:  Here's why.  Israel has been

15  recognized as -- the government that's in Israel has been

16  recognized by the United States for many years officially.

17  It's been done.  It's been documented.  We have relations

18  with that country and it's always been that way.

19         With Somalia, what was happening is for the past

20  20 years, and we can even go further back than that --

21         THE COURT:  But haven't you just -- it's come out

22  of your mouth, that you said that we recognized the

23  Transitional Government.

24         MS. ATWAL:  But it wasn't official.  What Matthew

25  Bryden --

1          THE COURT:  So I'm supposed to decide what is

2     official and not official and what a government is?

3          MS. ATWAL:  What I'm asking the Court to do is

4     when we're interpreting the guideline provision that we have

5     before us today, that the Eighth Circuit hasn't interpreted,

6     the Second and Sixth Circuits has interpreted to mean

7     international governments, I'm arguing to the Court that it

8     is vague, that what government is it supposed to influence,

9     the behavior of the defendant, what government are we

10    talking about.

11         THE COURT:  Well, if it's the Transitional

12    Government, why is that vague?

13         MS. ATWAL:  Well, first of all, whether it is --

14    first of all, whether it's the Transitional Government or

15    the United States government or rather it's the Ethiopian

16    government, was his behavior intended to --

17         THE COURT:  We know it wasn't the Ethiopian

18    government.  We know that the Transitional Government

19    invited the Ethiopian troops to come in.  It wasn't that

20    Ethiopia was invading Somalia, like it had many times

21    before.

22         MS. ATWAL:  Absolutely, yep.

23         THE COURT:  So what's the vagueness?  I'm still

24    trying to figure out what the vagueness is.

25         MS. ATWAL:  I'm arguing to the Court that it is

1    vague when the guideline itself just says "the government."

2              THE COURT:  Well --

3              MS. ATWAL:  I understand that the Court is saying

4    that the government is the Transitional Government.

5              THE COURT:  So you want me not to think of the

6    Transitional Government to be the government, but to be

7    vague and it could be something else.  How can I say that

8    it's the Ethiopian government --

9              MS. ATWAL:  Well --

10             THE COURT:  -- or the Ugandan government?

11             MS. ATWAL:  That's exactly my point.

12             THE COURT:  How could I say that?

13             MS. ATWAL:  I'm not asking the Court to say that.

14   What I'm saying is the guideline itself is vague.  It just

15   says "the government."

16             And here we have -- like I said, if the Court is

17   saying the government is the Transitional Federal

18   Government, the TFG, then, again, it wasn't officially

19   recognized until January of 2012.

20             But I will acknowledge that the U.S. had said we

21   recognize that government, not officially, but we do

22   recognize its standing as being the government right now,

23   back in 2007, 2008, and 2009.  But the official recognition

24   for that government didn't come until recent elections.

25             Moving on to my second part, the reason for this

1    enhancement was because Congress wanted to say, look, people

2    that are terrorists should be treated more harshly.  If

3    they're doing things to influence governments, they are more

4    likely to go back out and do it again and again, there's a

5    risk of people committing future crimes.

6          Somebody that's in Criminal History Category I can

7    be booted all the way up to Criminal History Category VI,

8    which grossly exaggerates the advisory guideline range.  And

9    in this case Mr. Hassan falls at the very maximum of

10   38 years because of that movement from Criminal History

11   Category I to Category VI.

12         There has been case law that said even on these

13   type of cases the court absolutely has the authority to say

14   that I'm going to depart below that, I don't have to treat

15   this person as in Criminal History Category VI.

16         And this is a perfect example of why somebody

17   doesn't -- with this terrorism enhancement, with the 12

18   levels and the Criminal History Category VI, shouldn't be

19   placed in that category, because it does grossly exaggerate

20   who this person is and the crime that he is being punished

21   for.

22         So I would ask the Court not to apply the 12-level

23   enhancement and not to place him in Criminal History

24   Category VI.  Now, as the Court is aware, in my position

25   pleading I have argued that if that is applied, I am asking

1    for a departure.

2              THE COURT:  Government's position dealing with the

3    terrorism enhancement under 3A1.4(a)?

4              MR. NARUS:  Yes, Your Honor.  And if I could back

5    up one moment.  You asked about objections.  We don't have

6    an objection, a factual objection necessarily, but with

7    respect to the proceedings, in paragraph 93 it says that

8    Mr. Hassan was debriefed in Yemen in late 2008 and we would

9    ask that that be January 2009.  I don't imagine that would

10   raise any objection from the defense.

11             MS. ATWAL:  No objection, Your Honor.

12             THE COURT:  That will be amended to 2009.

13             MR. NARUS:  Your Honor, with respect to the 3A

14   enhancement, I think we need to back up and look at

15   18 U.S.C. 2332b and this is what defines a federal crime of

16   terrorism.  There it says a federal crime of terrorism means

17   an offense such as, two of which the defendant committed,

18   2339A and 2339A [sic], which is to say he provided himself

19   to al-Shabaab and he provided himself to a conspiracy to

20   kill abroad.

21             So if you have those two offenses, then you move

22   to the second prong, which is is the offense calculated to

23   influence or affect the conduct of government by

24   intimidation or coercion or to retaliate against government

25   conduct.

1            What I submit to Your Honor that Congress was

2     intending here and what the guidelines are trying to capture

3     is crimes of terrorism that are within the jurisdiction of

4     the United States but not necessarily directed at the

5     government of the United States.  It can be directed --

6     terrorism can be directed internationally.  It can be

7     directed in Somalia, other countries.  And what Congress is

8     trying to capture here is that that conduct still

9     constitutes terrorism, whether it's directed at our

10    government or another government.

11           So moving from there to the facts of this case, I

12    would submit and the government would submit that there are

13    two governments here that the defendant's crimes were

14    intended to or calculated to influence or affect the conduct

15    of government.  First I'll start with the TFG, which has

16    been discussed here a second ago.

17           Mr. Hassan testified before Your Honor in a

18    separate trial, United States vs. Mahamud Said Omar,

19    and he testified for three days and Your Honor questioned

20    him.

21           One of the exhibits that we presented in that

22    trial and we plan to offer today at the appropriate time is

23    a picture from the training camp where Mr. Hassan trained in

24    Somalia between about February and June of 2008 after the

25    designation of al-Shabaab.  During this period of time the

1   people in this al-Shabaab training camp used a photograph of

2   the former president of the TFG for bullet practice.  And we

3   have that exhibit which we can present for Your Honor and we

4   plan to admit the video for appellate purposes.

5          We have also attached the transcripts to our

6   pleadings of Mr. Hassan's testimony, Mr. Salah Ahmed,

7   Mr. Abdifatah Isse, Mr. Ahmed Hussein Mahamud, and Mr. Matt

8   Bryden.

9          And part of that reason was to present to Your

10  Honor the specific facts so Your Honor can make a specific

11  finding on this, which our reading of the cases requires

12  Your Honor to make a specific finding supporting the 3A

13  enhancement.

14         Now, with respect to the TFG, a question that was

15  raised in defense counsel's pleading was whether the

16  defendant's motivation was to destabilize Somalia or to

17  overthrow the Transitional Federal Government.

18         Your Honor, we would cite the Court to Awan in the

19  Second Circuit, and it's in our papers, and it says that the

20  defendant's motive isn't what the court should focus on.

21  What the court should focus on is whether the effect of the

22  defendant's offenses was calculated to influence or affect

23  the conduct of government.

24         So here I submit to you that Mr. Hassan's crime of

25  providing material support to al-Shabaab after designation

1    clearly had the effect of destabilizing Somalia, of

2    providing support to a group that had as its objective the

3    overthrow of the Transitional Federal Government.

4            And Mr. Hassan, to his credit, testified to these

5    facts very candidly before Your Honor, that he learned these

6    facts in the training camp.  He certainly didn't know them

7    when he left here in the fall, but by the time that he was

8    providing himself in the training camp he had a very clear

9    understanding that al-Shabaab was a designated foreign

10    terrorist organization, that he was a member or trainee of

11    that group, and that an objective of that group was to

12    overthrow Somalia and I believe Mr. Hassan testified impose

13    its version of sharia law all the way to Jerusalem, I

14    believe is what one of the leaders told Mr. Hassan.

15            The second government that the United States would

16    submit is implicated here is quite plainly the objective of

17    this conspiracy.

18            Mr. Hassan in the beginning of Ramadan of 2007, in

19    what can only be described as a stark departure from his

20    life up until that point, left the United States to go to

21    Somalia to fight with groups aligned with the Islamic Courts

22    Union.

23            That conspiracy had as its objective to evict the

24    Ethiopians from Somalia and the defendant, as well as his

25    co-conspirators, all understood that that would involve

1      violence, it would involve AK-47s or machine guns, and that

2      it would not involve any sort of diplomatic effort to remove

3      the Ethiopians from Somalia.  This was a conspiracy to kill

4      and the defendant provided himself to that.

5                    With respect to whether the government is the

6      United States, Your Honor, the United States would refer you

7      to page 20 of our pleadings and cite to you the cases from

8      the Fifth Circuit, the case from the Northern District of

9      New York, as well as the Second Circuit.

10                   In those cases, Your Honor, other courts have

11     found that a conspiracy to disrupt or calculated to

12     influence the conduct of the country of Colombia, the

13     countries of Egypt and Pakistan, the objectives to

14     destabilize those countries or efforts that were calculated

15     to influence the conduct or retaliate against the conduct of

16     those governments was sufficient to satisfy the 3A

17     enhancement, the terrorism enhancement.

18                   I would also refer Your Honor to a case we cite at

19     page 20 to 21 of our pleading, United States vs. Assi,

20     A-s-s-i, a Sixth Circuit case from 2011, I believe it's

21     unpublished.

22                   And there the defense advanced a very similar

23     argument to the one that's being advanced here and that was

24     that Israel was not properly occupying the areas where the

25     defendant had acted, in other words, it had exceeded its

1    borders and for that reason did not qualify as a government

2    under the terrorism enhancement.

3          And the court there stated quite plainly that

4    Congress did not intend for United States district judges,

5    such as yourself, to determine whether a foreign state is

6    complying with its international obligations before

7    determining whether a person who has pled guilty to

8    providing support to a foreign terrorist organization is

9    subject to the rule.

10         Ms. Atwal is correct that the Eighth Circuit

11    hasn't ruled on this issue expressly.  Other courts have and

12    the United States would encourage Your Honor both to join

13    the other courts and find that the defendant's offenses were

14    calculated to influence the governments -- the Transitional

15    Federal Government and the Ethiopian government, which the

16    government submits is consistent with the purpose behind the

17    terrorism enhancement, with the purpose behind increasing

18    the statutory -- or the criminal history category and the

19    offense level by 12 levels to capture conduct started here

20    in the United States, here in the Twin Cities, that has as

21    its objective influencing governments around the world.

22         Finally, I would just refer the Court to a few

23    examples from Awan, it's A-w-a-n, where the court points out

24    and provides examples that someone who had intended to

25    murder the head of state and did so either for money or for

1   his own personal prestige would still be subject to the

2   enhancement because it's not his particular motive that is

3   the court's concern, but whether the offense that he is

4   committing is calculated to influence that government.

5            So here defense counsel's argument that Mr. Hassan

6   did not intend to overthrow the Transitional Federal

7   Government, the United States respectfully disagrees and

8   argues that it is the offense that he committed that should

9   be examined under these circumstances.

10           The second point I would make, leaving aside the

11  12-level enhancement, is the criminal history category,

12  moving it out to VI; and that certainly is a more -- that's

13  quite a substantial increase in the sentence here.

14           As we've pointed out in our response to

15  Ms. Atwal's pleadings, the movement out to Criminal History

16  Category VI is supposed to capture recidivism and the

17  concern of the sentencing guidelines and Congress about

18  recidivism and its effect on communities.

19           The United States submits that the movement out to

20  Criminal History Category VI under these circumstances takes

21  into account the danger attendant to recidivism by people

22  convicted of terrorism offenses.

23           A drug trafficker with prior convictions who

24  relapses into drug trafficking of course causes a scourge on

25  the community and furnishes drugs to people here in the

1    community.

2            A person convicted of terrorism offenses who

3    lapses into recidivism and commits terrorism offenses again

4    can commit unimaginable atrocities here in the United

5    States.

6            So the United States respectfully requests that

7    the Court find that the terrorism enhancement both

8    accurately captures the government here, which is the

9    defendant's conduct with both the Transitional Federal

10   Government and the government of Ethiopia, and that the

11   criminal history category of VI is appropriate under these

12   circumstances.

13           THE COURT:  Were you going to introduce -- you

14   said something about exhibits or something.

15           MR. NARUS:  Yes, sir.  We have labeled I believe

16   11 exhibits.  We've provided copies to the Court and to

17   defense counsel.  We've also provided an exhibit list to

18   Your Honor.

19           I should add that the plea agreement entered

20   between the parties in February of 2009 and a subsequent

21   plea agreement in August of 2009 both leave open both the

22   appellate rights of the defendant as well as the defendant's

23   right to contest the 3A enhancement in this case.

24           That hasn't always been the case.  There have been

25   other cases around the country where the 3A enhancement has

 1     not been contested pursuant to the plea agreement.  That is

 2     not the case here.

 3            And because this case -- both to make the record

 4     here as well as to assist the appellate court, we have

 5     attached 11 exhibits that include both an exhibit sticker

 6     for Your Honor for this sentencing hearing as well as the

 7     original exhibit sticker from the testimony of Mr. Hassan at

 8     the trial of Mahamud Said Omar.

 9            I can walk through these exhibits in chronological

10     order, but the exhibit I was referring to is marked for

11     purposes here as Government's Exhibit 6.  It was

12     Government's Exhibit 16 at the trial of Mahamud Said Omar.

13            MS. BELL:  Do you want me to put it up?

14            MR. NARUS:  Yes, please.  It's 116-007 at the

15     bottom, the fourth page.

16            Included in these exhibits, Your Honor, we have

17     included both the video taken at the al-Shabaab training

18     camp in the spring of 2008 as well as an ambush video

19     created by al-Shabaab in the summer, July, of 2008.  We've

20     attached those as -- attached the transcripts of those

21     videos.

22            THE COURT:  What's that?  Exhibit Number 7?

23            MR. NARUS:  That's correct, Your Honor, Exhibit

24     Number 7 is the training camp video.  Exhibit Number 9 is

25     what we have called the ambush video.  And I should note for

1    the record these were played during the testimony of

2    Mr. Hassan during the trial of Mahamud Said Omar and he

3    narrated aspects of these.

4              THE COURT:  And Exhibit Number 8 is the video of

5    the transcript, Number 9?

6              MR. NARUS:  Your Honor, Exhibit Number 8 are

7    stills of the video.  So we have attached both the video and

8    some stills.

9              THE COURT:  All right.  Any objections by the

10   defense?

11             MS. ATWAL:  No, Your Honor.

12             THE COURT:  Exhibits 1 through 11 will be

13   admitted.

14             Anything further for the government on this issue?

15             MR. NARUS:  No, Your Honor.  Thank you.

16             THE COURT:  Anything further for the defense?

17             MS. ATWAL:  No, Your Honor.

18             THE COURT:  All right.  The Court, having read the

19   submissions of counsel, the cases involving this matter

20   dealing with the enhancement under 3A1.4(a) dealing with a

21   terrorism enhancement, plus hearing the arguments in court

22   this afternoon, the Court will grant the enhancement, the

23   12-level enhancement, for felony offenses that involved or

24   intended to promote a federal crime of terrorism.  3A1.4(b)

25   provides that where subdivision (a) applies, the applicable

1      criminal history category is VI.

2              A federal crime of terrorism is defined as conduct

3      that is calculated to influence or affect the conduct of

4      government by intimidation or coercion or to retaliate

5      against government conduct and is a violation of crimes

6      listed in Title 18, United States Code, Section 2232b(g)(5).

7      Two of the counts of conviction in this case, Title 18,

8      United States Code, Section 2339A and Section 2339B(a)(1),

9      are listed in Section 2232b(g)(5).

10             To determine whether the crime of conviction was

11     calculated to influence, affect, or retaliate against a

12     government, it is not necessary that the defendant was

13     motivated to retaliate, influence, or affect the conduct of

14     a government.

15             The enhancement will apply where there is evidence

16     that the defendant intended to promote a crime calculated to

17     have such an effect, that his offenses were intended to

18     promote a federal crime of terrorism as defined by

19     2232b(g)(5), whatever the defendant's reason for committing

20     them.

21             The terrorism enhancement also applies to offenses

22     that are not themselves federal crimes of terrorism, but

23     where the evidence supports a finding that the crime was

24     committed with the intention of promoting a federal crime of

25     terrorism.  For example, a conviction for obstructing a

1    criminal investigation of a federal crime of terrorism can

2    be considered as promoting such a crime where such

3    obstruction prevents the government from finding out about

4    it.

5         In addition, it is not necessary that the federal

6    crime of terrorism affected the conduct of the United States

7    or was meant to retaliate against the United States.  The

8    enhancement applies for foreign governments.

9         Further, it is not necessary that the Court make

10   findings as to the legitimacy of the government affected or

11   retaliated against.

12        Based on the evidence in the record, the Court

13   finds that the terrorism enhancement clearly applies in this

14   case.  The facts stipulated to by the defendant in his plea

15   agreements and his trial testimony in the Omar matter

16   demonstrates that the defendant's actions involved or were

17   intended to promote crimes that were calculated to influence

18   or affect the activities of the Ethiopian government and the

19   Transitional Federal Government in Somalia.

20        He admitted to traveling to Somalia to fight

21   against the Ethiopians in order to cause their removal from

22   Somalia.  He also admitted that he did so under the

23   direction and control of al-Shabaab.

24        He testified that he learned more of al-Shabaab at

25   the safe house in Marka and its mission to take over

1    Somalia, then its neighboring countries, all the way to

2    Jerusalem, and to implement its own interpretation of sharia

3    law.

4         He admitted that he participated in training camps

5    and in combat with other members of al-Shabaab.  He

6    participated in recruitment videos produced by al-Shabaab,

7    which included the use of a photo of the former president of

8    Somalia for target practice.

9         The defendant also took actions that were intended

10   to promote a federal crime of terrorism when he provided

11   false statements to the FBI to prevent the FBI from finding

12   out about other members of the conspiracy here and in

13   Somalia.

14        And that's a brief summary of my factual basis for

15   granting the 3A1.4(a) enhancement.  My sentencing

16   memorandum, of course, will fully explain the Court's

17   reasons.

18        All right.  Let's move on to the next.

19        MS. ATWAL:  Your Honor, my second objection to the

20   PSR relates to the role adjustment.  The PSR and the

21   government argue that Mr. Hassan was an average participant

22   in this conspiracy.

23        When looking at this conspiracy as a whole, down

24   to the recruiters that were here in Minnesota, the leaders

25   that were in Somalia, to the minimal players that gave money

1    to al-Shabaab, Mr. Hassan's role was not average, it was

2    minor, and we are asking for a two-level reduction.

3            To support this I point the Court to his trial

4    testimony and what the Court heard during the trial of

5    United States vs. Omar.  And in that trial Mr. Hassan spoke

6    about how he was recruited into this conspiracy, how he was

7    told that it was his duty.

8            When he didn't have the funds to fly to Somalia,

9    they helped him and told him how to do the fund-raising.

10   When he couldn't get away with leaving to Somalia, they did

11   a fake itinerary for him to show his father so his dad would

12   let him go.

13           And then once he was in Somalia, he was constantly

14   under the watch of whether it was armed guards or other

15   people that were running the camp and people higher than

16   him.

17           When people did escape -- that was in early

18   February -- Mr. Hassan's phone was taken away.  He was not

19   allowed to make any type of communication with the outside

20   world.  And, again, the leaders or the people that were

21   higher up, they could absolutely do that, but he was kept to

22   his role, that being minimal -- minor, excuse me.

23           He was basically a foot soldier.  They told him

24   this is how you are going to train.  We want you to build.

25   We want you to go get water.  We want you to make a meal.

1    It's all those things that he was doing at the direction of

2    other people.  And then when he was told to go into ambush

3    and go to fight the troops, he did that as a foot soldier.

4            So the entire time -- if you look at the

5    conspiracy as a whole, to the leaders of al-Shabaab, the

6    ones that are always on the YouTube videos, the spokesman

7    for al-Shabaab, the people that made the video, all the way

8    down to the folks that are right here in Minnesota that

9    recruited him, respectfully I argue to the Court that his

10   role was minor compared to other people in this conspiracy.

11           THE COURT:  Thank you.

12           For the government?

13           MR. NARUS:  Your Honor, the government disagrees

14   with defense counsel's request for a role adjustment.

15           There are many ways that one can provide material

16   support to a terrorism organization or a conspiracy to kill

17   abroad and later this week Your Honor will hear other

18   defendants who provided different types of material support,

19   whether it's funding in the form of cash, whether it's rides

20   to the airport, whether it's assisting people with buying

21   plane tickets.  What Mr. Hassan did was in some ways the

22   most necessary form of support that al-Shabaab needs in the

23   form of people who are willing to carry guns and go into

24   battle.

25           On these facts, Your Honor, the defendant's

1    conduct of serving as a foot soldier, traveling to Somalia,

2    being trained, and then, in fact, conducting an ambush with

3    other al-Shabaab members certainly cannot be described as

4    minor.  The government would submit it's an average role for

5    a member of al-Shabaab who has made it to Somalia, graduated

6    from the training camp, and is participating in an ambush.

7              And for those reasons the United States

8    respectfully disagrees with defense counsel.

9              THE COURT:  The Court will deny the defense motion

10   for a role reduction.

11             Next matter.

12             MS. ATWAL:  The third objection, Your Honor, was

13   to the supervised release.  And as we stated in -- as we

14   signed in the plea agreements, originally we thought the

15   supervised release was two to three years.  However, upon

16   reviewing the statute I am in agreement with the Probation

17   Office and would agree that the life -- the supervision term

18   that the Court can impose is a lifetime supervision.

19             THE COURT:  There's no objection to that?

20             MR. NARUS:  No.  Thank you, Your Honor.

21             THE COURT:  Okay.  The supervised release is two

22   years to life.

23             Anything further for the defense dealing with the

24   advisory guideline calculations?

25             MS. ATWAL:  No, Your Honor.

1          THE COURT:  Anything further for the government

2     dealing with the advisory guideline calculations?

3          MR. NARUS:  No.  Thank you.

4          THE COURT:  The Court finds that the total offense

5     level is 44, the criminal history category is VI, custody

6     range is 456 months, supervised release is two years to life

7     imprisonment, fine range is 25,000 to 250,000 dollars, and a

8     mandatory special assessment of $300.

9          Ms. Atwal, do you wish to argue for a variance?

10          MS. ATWAL:  I do, Your Honor.  And I apologize.

11     Before I go to the variance, I would like to speak of my two

12     departure motions.

13          THE COURT:  Departure.  Go ahead.

14          MS. ATWAL:  One is the traditional one for

15     overstated criminal history.  As the Court has already ruled

16     that Mr. Hassan --

17          THE COURT:  Let me stop you there.  I think we can

18     eliminate a number of these things by the government has

19     filed a motion for a 5K1.1 downward departure because of

20     substantial assistance.

21          The Court has received *ex parte* and *in camera* --

22     no, it's not *ex parte*, you've seen it -- *in camera* and under

23     seal their reasons for submitting this motion to the Court

24     for a substantial assistance departure for Mr. Hassan.

25          Is there anything else that I need to know -- I

1    know that I received a letter from you this weekend

2    regarding your position dealing with the 5K.  You might as

3    well put that on the record.

4              MS. ATWAL:  Yes.

5              THE COURT:  And anything else that you feel the

6    Court should know about the 5K1.1 substantial assistance

7    motion made to the Court by the government.

8              MS. ATWAL:  Yes, Your Honor.

9              THE COURT:  I'm assuming that you agree with it.

10             MS. ATWAL:  I do, and I am asking the Court to

11   grant that motion.

12             I have never seen a case where there's been this

13   level of cooperation.  I've been working in the federal

14   system for 12 years, worked with a lot of defendants and a

15   lot of them have cooperated.  And the only word that comes

16   to mind is extraordinary.  The amount of defendants he was

17   able to provide information and the government could in turn

18   prosecute was outstanding.

19             He was the first one in the door, cooperated

20   without a lawyer, and throughout this whole process there

21   was times when Mr. Mohring and I weren't available and he

22   didn't hesitate not once, to say, nope, I want my lawyer

23   here.

24             When there was a member of our community that went

25   missing in Somalia and word got out that that young man had

1    died, I remember I was on vacation and Mr. Hassan right away

2    said let me help you out so I can bring answers to this

3    community so they can know what happened to that young man

4    that left.

5           Whenever these gentlemen over here, the agents,

6    wanted him, he was there.  Whenever they went to the jail,

7    he didn't ask for a special room.  He didn't ask that the

8    FBI stay hidden.  They met out there in the open where other

9    inmates can see clearly that's not Manny Atwal he is meeting

10    with.  They could see that.  They knew what he was doing.

11           And the four years that he's been in prison, I'm

12    not talking about the first seven where he was with the FBI,

13    for four years in and out he has seen people come and go,

14    come and go, and Kamal sits there.  And they all know what

15    he is doing.  They all know he is cooperating.

16           Perhaps the most terrifying thing was when he took

17    that stand and testified, again, to get credit, but also, as

18    he said in his letter, I owe it to my community so they hear

19    what happened.  And this Court didn't take it easy on Kamal.

20    This Court asked him a lot of deep questions.

21           And when that video was played, he told me his

22    stomach was upset watching it and that he was upsetting the

23    Court, but he's like I have to do this because I did do it,

24    I committed a crime.

25           And when they would play, when the government

1     would play this video, when foreign agents would come and

2     play the video and ask him questions, he would tell the same

3     story over and over again.

4            Sometimes our proffers would be eight to ten

5     hours.  Sometimes it would be 6:00 at night, let's meet,

6     we've got to get this going.  And he kept doing it every

7     single time.

8            Kamal, we want you to wear a wire.  Okay, I'll do

9     it.  Kamal, we need you to make a phone call at 3:00 in the

10    morning.  I'll do it.  Kamal, we need you to send e-mails.

11    I'll do it.  Every step of the way he did it.

12           And his family who sits in the second row to the

13    Court's left, they wanted to assist.  Let's not forget how

14    this all started, why Kamal is standing here and not six

15    feet under in Africa or not someplace in Yemen living his

16    own life.  That family reached out and said, FBI, we know

17    where Kamal is and he wants to help.  And we've heard about

18    the extraordinary efforts that the United States government

19    took to assure that Kamal was safe and to bring him back to

20    the United States.

21           Now, I know a big part of the cooperation is that

22    he did lie for those seven months, and what he did was he

23    left out people that were here in Minnesota because he

24    feared for his safety and his family's safety.  Let's not

25    forget that one of the people he left out was the person

1    that did a false itinerary for him, told him how he can get

2    away with it, told him it was his duty.

3            And let's not forget the people that he left out

4    in Somalia were the folks that when he said, Look, my dad is

5    going to the mosque, he's causing a ruckus, I need to go

6    home, they said, You're not going to go home.

7            And when him and Salah Ahmed wanted to leave and

8    discussed leaving, they were shown videos.  This is what

9    happens to people that try and leave al-Shabaab, you're

10   dead.

11           So he left out the names of the leaders down

12   there, Samatar and a woman named Hooyo, who ran one of the

13   safe houses, and he left out a Minnesotan.

14           And the biggest thing he left out was that he was

15   involved in the ambush.  And as he very eloquently put in

16   his letter to the Court, something I did not help him with,

17   Mr. Mohring didn't help him with, the same thing he told the

18   Court during the trial is he didn't want the government to

19   think he was a terrorist, that he was a bad guy that would

20   pick up guns and do harm to people, and he left that out.

21           But after April 1st the government has trusted him

22   100 percent.  How do we know that?  They put him up there

23   and had him testify for the whole world to hear and he sat

24   there and he listened and he answered their questions, he

25   answered the Court's questions, he answered Mr. Hopeman's

1      grueling cross exam that lasted over a day and a half.  And

2      never once did he waiver from his story.  He kept admitting

3      over and over again what he did.

4              He was proactive in his cooperation.  When the

5      government wanted to investigate somebody or when they

6      wanted to investigate something that was going on in

7      Somalia, Kamal would say how about we try this or let's word

8      the e-mail in this way because then people are going to

9      really know it's me or when he was doing undercover work he

10     would make suggestions such as let my family set up the

11     meeting so when I go in and meet with the person you are

12     investigating, it looks more natural.  He was proactive in

13     his cooperation, and we don't see that very often.  Without

14     counsel, without hesitation he went to the limits.  He did

15     everything he could.

16             Mr. Hassan has asked us over and over again what's

17     going to happen, what's going to happen here today.  And we

18     don't know, but what I can tell Mr. Hassan is he's done

19     everything that he could.

20             And he wants to continue helping no matter what

21     happens here today.  If he goes to prison for 38 years, if

22     he goes to prison for 20 years, it doesn't matter to him

23     because at the end of the day he wants everybody in this

24     courtroom to know and everybody who reads the media and

25     responds to the media and particularly his parents that he

1       is so sorry for what he did and the only way he can think of

2       to prove that is not his words, but his actions.

3                So if the government calls tomorrow, even after

4       they have said what they need to say -- obviously they are

5       advocating for their sentence -- he is still going to be

6       there for them.  He's going to be there if they need him.

7                You may recall at the detention hearing that we

8       had back in September the government argued that he

9       shouldn't be released and made comments about Mr. Hassan

10      that weren't very nice, that he didn't feel were very nice

11      to him.  He didn't hesitate.  He still continued to

12      cooperate.

13               Whether it's international, whether it's his own

14      government here in the United States, he was the first one

15      in and continued to cooperate.  And although he lied at the

16      beginning, he's been truthful ever since.

17               The government even today in their position

18      pleadings cite to Mr. Hassan's own testimony, his own words

19      to advocate for their sentences in the other defendants'

20      cases.  That's big.

21               And even though he left out Mr. Mohamed initially,

22      let's not forget he was eventually prosecuted and when the

23      government called on him to testify against him he said,

24      absolutely, I will do it and sat through trial preparation

25      and went through the story over and over again.  And

1        Mr. Mohamed knew that Kamal was going to be a witness

2        against him and eventually he did plead guilty.

3                So although he made a mistake about him, he did

4        come clean and the government was able to prosecute the

5        individual and Kamal was in full agreement that he would

6        testify.

7                I just have to say again his cooperation, as I

8        state in my position pleading and the letter, again, that I

9        sent to the Court, is extraordinary, it's significant.  I

10       don't even know the full extent of all of his cooperation.

11               But I do know this.  What he has done to show his

12       remorse, to cooperate with the government, to keep his end

13       of the bargain from when he was in Yemen and when he turned

14       himself in and made that decision to cooperate, he's kept

15       his end of the bargain and for that, Your Honor, he deserves

16       a very significant departure.

17               THE COURT:  And you saw the recommendation of the

18       government.  Do you agree with that recommendation?

19               MS. ATWAL:  I do not, Your Honor.  I think it

20       undermines -- it doesn't give enough credit to where credit

21       is deserved in this case.  And I'm not talking about

22       variance factors.  I'm simply just talking about the

23       cooperation here.

24               I do believe it is beyond what I have seen.  In

25       looking around the country at other people, other people

1    that are similarly situated in Mr. Hassan's position --

2    there's not that many -- his level of cooperation seems

3    extraordinary.

4          The sheer numbers, the type of cooperation he has

5    done, the fact that he called from Yemen and said, yes, I

6    will help out, those are very significant different factors

7    than we see in our everyday cooperation cases.

8          So when the government speaks of going from 38

9    years to lower, for me my starting point doesn't come up to

10   38 years, as I know the Court has just ruled, but there are

11   other factors also, but looking at it as a whole, I think

12   it's worthy of a larger departure than what the government

13   is requesting.

14         THE COURT:  Anything the government wishes to tell

15   the Court dealing with its motion for a downward departure

16   based on 5K1.1?

17         MR. NARUS:  Your Honor, the government has set out

18   its position in what I hope is great detail for the Court to

19   assist it with its determination.  Mr. Hassan's cooperation

20   has been sustained, elaborate, and very productive for the

21   United States.

22         THE COURT:  You can use the word "extraordinary,"

23   as you did in your papers.

24         MR. NARUS:  Extraordinary, Your Honor.  He has --

25   but for one decision he made with respect to omitting

1       certain information, it would be what one would hold out as

2       the textbook example of what someone should do if they get

3       in too far in a terrorist group, that there is a way out.

4              And but for his false statements to us over ten

5       weeks, his conduct on that regard was to come in and to meet

6       with the FBI, to agree to testify right away, to be the

7       first one to agree to testify.

8              As we explain in our papers, Your Honor, the

9       timing of the defendant's cooperation was of extraordinary

10      significance to us, to the United States.

11             If I could take us back to January of 2009.  At

12      that time -- and the chart that we have submitted as

13      attachment I believe 2 and we have attached another copy to

14      our exhibits today, the chart of the Minnesota travelers to

15      Somalia.

16             In January of 2009 there was something of an

17      epidemic going on in the community.  Shirwa Ahmed, number 2

18      on this chart, had detonated a suicide vehicle-borne

19      improvised explosive device in Somalia killing I believe 20

20      to 30.  Salah Ahmed and Abdifatah Isse had returned to the

21      United States and were in the United States, both known to

22      the FBI at that time.  Mr. Hassan was known to the FBI

23      before he called.

24             THE COURT:  You should go back to Mr. Ahmed.  The

25      detonation did not kill Ethiopian troops.

1         MR. NARUS:  This is true, Your Honor.  In fact, it

2    was targeting the United Nations, an Ethiopian government

3    building there in Somalia.  But as Mr. Bryden testified, and

4    I couldn't quote his exact words, this suicide bombing had

5    the effect of killing Somalis and particularly Somalis who

6    were not carrying guns or part of the militia, but Somali

7    people who happened to be in the vicinity of these suicide

8    bombings, these five coordinated suicide bombings that

9    Mr. Bryden testified were the work of al-Shabaab.

10        Almost immediately after those bombings, within

11   the next week, seven men left the United States for Somalia

12   and those families came into the FBI and reported their sons

13   missing.

14        So in January of 2009 when the FBI and the United

15   States Department of Justice, the assistant U.S. attorney

16   made contact with Mr. Hassan in Yemen, it was a time of --

17   it was a time when there was a need for a window into what

18   had happened here.

19        And Mr. Hassan, although he didn't open the window

20   or pull up the blinds all the way, to his detriment and to

21   our detriment, he did admit that he had joined a terrorist

22   group, he did admit that he had trained with them, and he

23   implicated himself in this conspiracy.  He pointed out some

24   of the people who were involved and he omitted others.

25        But the timing of his cooperation allowed the

1    United States to later arrest Abdifatah Isse.  Mr. Hassan

2    entered his guilty plea on February 18th of 2009.  The grand

3    jury returned an indictment on Abdifatah Isse and Mr. Salah

4    Ahmed the following day, and about six days later Abdifatah

5    Isse was arrested leaving the airport in Seattle on his way

6    to Tanzania.

7         So Mr. Hassan's timing of entering his guilty plea

8    and agreeing to cooperate and implicating Mr. Isse in this

9    conspiracy and Mr. Ahmed allowed the United States to arrest

10   Mr. Isse as he departed the United States for Africa.

11        Mr. Isse, as evident during the trial, agreed to

12   cooperate and eventually entered his guilty plea in April of

13   2009.  Shortly thereafter Salah Ahmed was arrested in July

14   of 2009 here in Minneapolis.  He also agreed to cooperate.

15        So the defendant's cooperation started this

16   process and he deserves credit for that.  He did so without

17   demanding significant discovery.  I believe we turned over

18   some discovery, but very minimal to Ms. Atwal and

19   Mr. Mohring.

20        He agreed to cooperate, he entered his plea under

21   seal, and he agreed to reside at an FBI-furnished facility

22   under very close guard of FBI agents 24 hours a day.  He was

23   not allowed to leave without being escorted by FBI agents.

24        But he did that at a time when his presence in the

25   United States was not known and he was able to assist with

1    gathering evidence here in the United States against people

2    in Somalia as well as people in the United States.  So the

3    timing of his plea also allowed us to gather evidence

4    against co-conspirators proactively here in the Twin Cities.

5         Ms. Atwal mentioned the false statements.  And as

6    we pointed out in our papers, those were troubling and those

7    were particularly troubling because at that period of time

8    the FBI agents and Mr. Hassan, the assistant U.S. attorneys,

9    and Ms. Atwal and Mr. Mohring were all seeing each other on

10   a very regular basis.  The agents and Mr. Hassan, of course,

11   saw each other all waking hours.

12        And so at that point in time his omissions of

13   involvement of particular people, particularly the ones in

14   the United States, cost the United States opportunities that

15   could have been there otherwise and, as we pointed out, made

16   it more difficult to call him as a witness without

17   corroboration, which we later obtained from other

18   defendants.

19        Ms. Ahmed [sic] has discussed a number of cases

20   that the United States has charged based off of information

21   provided in part by Mr. Hassan.  I will refer the Court to

22   the letter, but I would not dispute Ms. Atwal's

23   characterization that it's substantial and significant and

24   set in motion this process we've discussed here where

25   following the plea of Salah Ahmed, Adarus Ali was approached

1    and agreed to cooperate.  Shortly thereafter other

2    defendants were charged, and the other aspects of that have

3    been recounted in the pleading before Your Honor.

4           Mr. Hassan's cooperation also included trial

5    testimony.  Your Honor questioned him directly throughout

6    his direct and his cross examination and asked him very

7    pointed questions about his motivation and his change of

8    heart or decision to go to Somalia where he had no

9    indication that that would happen based on his prior

10   conduct.

11          Mr. Hassan deserves credit for testifying in

12   court.  Of course that's not easy ever, but I would imagine

13   it's particularly difficult in a case such as this with

14   these charges and against a defendant such as Mr. Mahamud

15   Said Omar.

16          So unless the Court has specific questions with

17   respect to the 5K, I would leave it at that.

18          THE COURT:  All right.  Anything further for the

19   defense?

20          MS. ATWAL:  Just very briefly, Your Honor.

21          Something that the government just touched on was

22   sending a message to other community members.  And in this

23   case one of the messages should be if you commit a crime

24   such as this, you will be prosecuted, such as just what

25   happened to Mr. Hassan.

1          But two, if you cooperate and you choose to help

2     the government, all those kids that are still missing and

3     still living in Somalia or around that area, I'm presuming,

4     the message should be given to them if they turn themselves

5     in and if they cooperate to the extent Mr. Kamal -- or

6     Mr. Hassan has, that there is hope for their future, that

7     they're not going to be stuck in prison for 38 years or 30

8     years, that they will be rewarded if they choose to help the

9     United States.  And that is something Mr. Hassan did with

10    the assistance of his family.

11         Second thing I wanted to point out was because he

12    was able to give the names of other individuals, those

13    individuals were charged and in turn they turned around and

14    they cooperated also.  So he does deserve credit for that

15    also.

16         And finally, when he was a witness, yes, the issue

17    of him lying or leaving out information to the FBI was

18    brought up and he was cross-examined on that at great

19    length.  But one of the good things that Mr. Hassan did is

20    during that trial preparation he never minimized that, he

21    never minimized it on the witness stand.

22         But he also was very helpful in his trial

23    preparation and reminded the government about one phone call

24    that was played to the jury where Sharif -- the defendant's

25    name was mentioned and it was something that came up during

```
 1     trial preparation when Mr. Hassan turned to the agents and

 2     said, Remember there's that phone call that I made and we

 3     know Sharif was in Somalia at the time.  That was

 4     instrumental.

 5             So the government has said that it hurt their

 6     case, and I can't speak for their whole investigation.  I

 7     know Mr. Hassan's testimony was very helpful at the time of

 8     the trial.  It was helpful in the sense that the defendant

 9     was convicted.

10             THE COURT:  The Court has reviewed the submission

11     of the government and the submission of defense counsel

12     dealing with the government's motion for a 5K1.1 downward

13     departure based on substantial assistance to the government

14     and the Court will grant that.

15             I need a sidebar.  I just want to put something on

16     the record.  Sidebar.

17         (At sidebar.)

18             THE COURT:  I met with the government without your

19     presence for close to two, two and a half hours this morning

20     and quizzed them about every aspect of the cooperation of

21     your client and so I do have, I suspect, more than your

22     knowledge --

23             MS. ATWAL:  Yes.

24             THE COURT:  -- of what's going on.

25             That will be part of my reduction in his sentence
```

1    and so I'm asking -- sometimes the Court of Appeals gets

2    prickly about departures and since I can't put all that on

3    the record, so they are going to say we don't know why I

4    made that decision, but I just want to make sure there's a

5    record that I met with the government.

6            And I think you would agree I quizzed you and

7    received as much information as you could give me.

8            MR. NARUS:  Yes, Your Honor, the government

9    concurs.  And I would just add that I spoke with Ms. Atwal

10   beforehand and advised her of the meeting, and I believe she

11   said that was acceptable to her.

12           MS. ATWAL:  Yes.  And it's something I did discuss

13   with Mr. Hassan, anticipating that that could happen.

14   Obviously I can't be privy to everything.  So we were in

15   agreement with it.

16           THE COURT:  All right.

17           MS. ATWAL:  Thank you.

18           MR. NARUS:  Thank you, Your Honor.

19       **(In open court.)**

20           THE COURT:  All right.  Ms. Atwal.

21           MS. ATWAL:  Your Honor, moving on to reasons as to

22   why a variance should be granted in this case.

23           I don't think it's been any secret how I feel

24   about this case.  It's been a third of my career here, four

25   and a half years, and during that time period I've gotten to

1    know Mr. Hassan.

2            I still remember the day he called from Duluth and

3    I thought it was a joke when he said, I'm one of those kids

4    that went to Somalia and I've been in Yemen and I just

5    arrived here with a prosecutor and three agents and we

6    traveled in a desert in a jeep.  We've been staying at

7    hotels.  I'm in Duluth and they told me I should get a

8    lawyer.

9            And I remember thinking this has got to be some

10   kind of joke because it sounded like something out of a spy

11   thriller.  It didn't seem real.  But it was real and this is

12   why we're here today.

13           And the more I got to know Mr. Hassan and

14   particularly his family, the behavior was very surprising.

15   When I first met his father, as was testified at trial, he's

16   a very scarey individual that demands nothing but the best

17   from his children.

18           THE COURT:  I would like to hear from him before

19   the sentencing.

20           MS. ATWAL:  Unfortunately, Your Honor, as stated

21   in the PSR, soon after Kamal was scheduled to be released

22   back in September of 2011, things went terribly wrong at

23   home.  His parents separated and his father has left the

24   country and now lives in Egypt.

25           But his frustration over the case and his words to

1      Kamal were work with the FBI and they will take care of you.

2      He demanded answers from the mosque.  He demanded answers

3      from people in his community.

4            And I think more than anything that's what Kamal

5      feels horrible about.  As he said in his letter to the

6      Court, he doesn't know if it was all the stress that was

7      going on.

8            Because in his family everybody contributes to the

9      household.  As the eldest boy out of eight kids, it was his

10     responsibility to bring home the paycheck and make sure mom

11     and dad got the money.  His parents at the time owned a

12     restaurant, which after Mr. Hassan left for Somalia they

13     lost the restaurant, they lost the family home.

14           He was influenced in a lot of ways and it doesn't

15     rise to the level of coercion and duress for a traditional

16     departure, but I ask the Court to consider it when

17     considering a variance.

18           He had heard things around the city.  We all know

19     of the protests that were going on even right outside this

20     courtroom -- outside the courthouse and the Metrodome and

21     Peavey Park where there was such things chanted as the

22     Islamic courts are okay or the Ethiopians need to get out.

23     It was all that rhetoric that was put into his head.  People

24     were telling him Ethiopians are raping women, they're

25     burning down houses, and they need to get out of Somalia.

1          And Mr. Hassan, being a 22-year-old, took it to

2     heart and suddenly when he was being told by the

3     facilitators it's your duty, you need to go back to your

4     native land and fight, he bought into it.

5          And I believe as one community member told the

6     probation officer, they wished these kids had turned to

7     them, they wished that they had turned to them and said, Is

8     this the right thing?  Are we supposed to be doing this?

9          Instead he got caught up in this whole

10    nationalism; I am going to go back and fight for my native

11    country.  And once he got there, he learned that he was

12    lied to.

13         Recently while at the jail he's now read the Quran

14    in English, which he understands, and he tells me all the

15    stuff they were telling me that was in the Quran, that's not

16    true, it is not true.

17         And when he tried to leave, when he realized how

18    bad he was in trouble in Somalia, when he tried to leave he

19    wasn't allowed to leave.  His passport was taken away.  When

20    Mr. Isse and Mr. Ahmed left, the camp was put on lockdown.

21    There was armed guards.  He couldn't leave.

22         He tried everything he could and he knew after the

23    ambush that he was going to be rewarded and his reward was

24    you don't have to go around with guards.  And the first

25    opportunity he got he was able to make it to Mogadishu, make

1    phone calls and get out of the country.  And we all know

2    what happens afterwards.  He's able to start working with

3    the government.

4           He also was warned with threats of the videos, the

5    videos that he saw, like if you leave al-Shabaab this is

6    what will happen to you.  When Shirwa had abandoned the camp

7    and tried to come back, he saw what happened to Shirwa.  He

8    was scared.

9           His actions were driven by that of what he was

10   told, that it was his duty to fight the Ethiopians.  As he

11   has said over and over again, him going there was not

12   anti-American.  He didn't want it to be hateful to

13   Westerners.  The speech that he reads in that video, as he

14   states, was written by Farouk, one of the individuals that's

15   on the FBI's Most Wanted.

16          Why should the Court believe that?  Why should the

17   Court trust that statement that it was written for him?  The

18   same reason why he left al-Shabaab and the same reason why

19   he asked for their help, he means it.

20          Back when he left in 2007 al-Shabaab wasn't all

21   over YouTube, they weren't in the social media group.  They

22   didn't get that footing until almost a year later where they

23   all of a sudden started advertising.

24          And he left al-Shabaab in August of 2008, that

25   fall of 2008.  We know by January of 2010 al-Shabaab was

1    making connections with al-Qaeda, two years after he had

2    left al-Shabaab.

3            And as Matthew Bryden testified, there were many

4    people in Somalia that sided with al-Shabaab but didn't buy

5    into this religious message.  They didn't buy into there has

6    to be sharia law.  They were doing it as a sense of

7    nationalism.  And that's where Mr. Hassan came from, that he

8    was told it was his duty, he was encouraged to do it.  He

9    was hearing what was going on in his community and he went.

10           As he told the Court and told the jurors, it's one

11   of the biggest regrets he ever made, not only for going over

12   there and lying to his parents, not only because he was

13   prosecuted for it, not only because he faces a hefty prison

14   sentence, but because of the way it makes him look and the

15   way it makes his community look.

16           We've used the word "terrorism" over and over

17   again during these proceedings and that is a hard label for

18   this young man to wear.  It's a hard label because that's

19   not the way he sees himself.

20           He has never once denied the indictments in this

21   case.  He's never denied his role in this offense.  But that

22   word is thrown around and it's used quite a bit, but that's

23   not the way he sees himself and he's hoping, just hoping

24   just a little bit that that can be chipped away by his

25   cooperation that he has shown to the government.

1          He's a young man that has a very strong family.

2    The Court may recall, again, at the detention hearing when

3    the family stood up and said they will stand by him and make

4    sure he does right.

5          And his poor younger brother, the one who used the

6    Internet, took the laptop and used the Internet at Macy's,

7    that kid is never going to live it down.  His brother has

8    told me over and over again how he felt.  But I think the

9    person who felt the most guilt was Kamal because he said he

10   never should have put his brother in that position.

11         So he has sat in jail, sat in jail for over four

12   years.  And we all talk about hard time and usually when I

13   get up here and argue about hard time, I'm talking about a

14   year or so.  This is four years.  Seven months with the FBI,

15   again, under close guard, but four years in a jail cell and

16   he is in special housing, so he is usually housed with

17   people with serious sex offenses.

18         And not once has he complained, not once has he

19   complained to the agents, not once has he complained to the

20   government.  He keeps his nose down and tries to do the best

21   that he can.

22         He's outlined to the Court what he plans to do

23   with his future and I want to read to the Court one of his

24   statements that he wrote that I thought were pretty

25   important.

1           In his letter to the Court he wrote, (As read) "I

2     don't know what my sentence will be on Monday.  I don't want

3     to go to prison, but that's not my choice.  No matter what

4     my sentence will be, I will keep my word to you.  I will

5     forever continue to prove I'm a good citizen by continuing

6     to cooperate and helping.  I will work on making up for all

7     my mistakes and the choices that hurt my family.  I will

8     never be able to tell you or the government how sorry I am.

9     I left al-Shabaab.  I left and want nothing more to do with

10    them.  Kamal Hassan."  Those words aren't just words on

11    paper.  It's what he feels in his heart and in his head.

12          Telling this to you, Your Honor, is one thing.

13    For him to tell this to his family so they understand how

14    truly sorry he is -- he's never going to forgive himself for

15    what's happened to his parents' marriage.

16          And his parents can say the problems were always

17    there, but for him he does the math.  When he left, the

18    family finances went to trying to find him.  They lost

19    everything.  And with eight mouths to feed, that becomes

20    tough.

21          Now he has a wife who came with him from Yemen and

22    while he was living in the safe house his wife was pregnant.

23    He had got taken into custody and his wife had the baby.

24    His wife has been living with in-laws that she has just met

25    without her husband.

1              And Zaynab, who sits in the back -- I don't know

2      if she went out with the baby -- she barely speaks English.

3      All she knows is that her husband had joined al-Shabaab.

4      And in her letter to the Court, again, she talks about the

5      great disappointment when she heard who Kamal had aligned

6      himself with, but she stands by her husband because she

7      knows that he's truly remorseful for his actions.

8              Taking into consideration who he was, Your Honor,

9      in that period of time when he was 22, now he's 28, he's a

10     father, he is a husband, and he is somebody that is

11     constantly trying to prove to everybody here that he has

12     changed.

13             And people say, you know, terrorists won't change.

14     At the very beginning of the government's argument they

15     talked about that one of the reasons for this enhancement is

16     to prevent recidivism, to stop people from doing terrorist

17     acts in the future.  Hasn't Kamal Hassan shown that he is

18     not likely to do that, shown it by leaving a terrorist

19     organization, shown that by cooperating with the government,

20     shown that by reaching out to the government?  Standing

21     before you is not somebody that's dangerous.

22             Let's send the message to the community you will

23     be punished if you do things like Kamal did.  Four and a

24     half years in custody is a long time, and the Court holds a

25     big hammer.  If the Court wants to give him a lifetime

1    supervision, the Court can absolutely do that, control all

2    of his movement, continue his cooperation with the

3    government.

4         I'm asking the Court for a significant departure

5    based on the cooperation, but also to take into

6    consideration everything I've just said when considering a

7    variance.  Four and a half years in custody and a lifetime

8    of supervision serves as a deterrent, protects the public,

9    and all the other sentencing factors that 3553(a) talks

10   about that's taken into consideration.

11        Thank you.

12        MR. NARUS:  If I could have Exhibit 1.  Your

13   Honor, I would just like to take us back through the

14   defendant's crime as Your Honor considers the sentence to

15   impose under these circumstances and along the way I intend

16   to address several of Ms. Atwal's arguments.

17        In the fall of 2007, starting in Ramadan, the

18   defendant learned of an opportunity to go to Somalia.  He

19   learned of it, as he testified, from Salah Ahmed.  And he

20   had an interest in going to Somalia for a number of reasons.

21   His fiancée was there, as he testified.  He felt a desire to

22   come to the duty -- or a duty to come to the defense of the

23   Somali people who he had believed were being subjected to

24   the will of the Ethiopian military.  He said he felt a

25   connection with the other men involved in it and he said he

 1     felt a sense of adventure.  In his letter to Your Honor he

 2     also pointed out that he was going to a different country

 3     and being on a plane excited him.  In very candid remarks to

 4     Your Honor he pointed out his reasons for joining this

 5     conspiracy.

 6          He was given opportunities.  Mr. Hassan was

 7     unsophisticated, I would submit, and not capable of booking

 8     his own flight at that time.  Perhaps he was, but he didn't.

 9     He had to have those arrangements made for him.  He didn't

10     know anybody affiliated with this group in Somalia, but

11     members of this group did.

12          And Mr. Hassan joined this group and I would

13     submit to Your Honor did so and made a very terrible

14     mistake, and I think he has laid that out for Your Honor.

15     But he made that mistake on his own.  He wasn't coerced into

16     making that mistake and it wasn't under duress.  He could

17     have had motivations that encouraged him to make a mistake

18     he wouldn't ordinarily make, patriotic motivations and

19     religious motivations, but he made this mistake of his own

20     free will and after he made that mistake he found some

21     excitement or some adventure in that decision.

22          And I think that's important for two reasons.

23     One, he wasn't -- his will was not overborne, he wasn't

24     pressured mercilessly to make this trip to Somalia.  He made

25     the decision to make it.

1          And I think that cuts both ways.  He accepts

2     responsibility for that, so he shouldn't get a lesser

3     sentence because of some imperfect coercion or imperfect

4     duress, but I think under the government's view of this it

5     indicates a less likelihood that he would be subject to this

6     sort of pressure and cave in again.

7          In other words, he made this decision on his own,

8     of his own free will, recognizes the error of that decision,

9     and has now agreed to cooperate with the United States for

10    his own motivation, which is to lower his sentence, but also

11    to get the story out to the community and help the United

12    States investigate these crimes.

13         In the fall of 2007 when these men began working

14    on this conspiracy, when they began coming up with these

15    ideas on going to Somalia, they didn't consult the elders at

16    the mosque, they didn't consult their parents.

17         They were not similar to men joining the military,

18    the United States military.  It was not a celebration.

19    These activities were taken in secret.  They were taken

20    without consulting people who would know better, such as

21    their parents and senior members of the mosque.  These men

22    made this decision in secret and then decided to leave.

23         If we could go to Exhibit 2, Ms. Bell.  They met

24    at restaurants, one of which is the Ainu Shams, and there

25    they spoke with someone, Samatar or Said Fidhin, who eased

their immersion into Somalia.  He had the hotels in northern
Somalia in Hargeisa and then he welcomed them into Mogadishu
and from Mogadishu sent them to the safe house in Marka.

At this time Mr. Hassan sought to go see his
fiancée in Mogadishu and made a trip up there, but wasn't
permitted to see his fiancée.  At the same time his father,
who truly deserves the credit for, in the government's
opinion, Mr. Hassan being here today, his father influenced
Mr. Hassan, encouraged him to come to the FBI, and put the
FBI in contact with Mr. Hassan.

Mr. Hassan went to Yemen, where his fiancée or
perhaps wife at the time had already relocated.  Mr. Hassan
followed her to Yemen, where Mr. Hassan's family met him and
his fiancée and his fiancée's sister.

When the men left for Somalia they used
subterfuge.  They used a false itinerary.  They not only
didn't tell their parents, they affirmatively lied to their
parents.

And Mr. Hassan in particular, who had the family
support that Ms. Atwal mentions, knew that he wasn't going
to get his passport and leave the country without convincing
his parents that he had a legitimate reason for leaving the
community, leaving the Twin Cities.

And with the help of co-conspirators, who will be
before Your Honor later this week, he was able to obtain a

1   false itinerary.  If we could bring up the false itinerary.

2   This was used for the parents, to convince the parents to

3   allow their children to go or at least Mr. Hassan's family

4   to go.

5          And, Your Honor, Mr. Hassan's mother has written a

6   letter where she conveys the guilt she feels for being

7   convinced by this, but this letter was a letter from a

8   travel agency, a legitimate document.  Of course no way

9   anyone could tell that it was not legitimate.  But it was

10  what was used to effect this conspiracy to go over to

11  Somalia, to leave the United States.

12         From there Mr. Hassan met up with his cohorts, who

13  are pictured on Government's Exhibit 17 from the trial, and

14  all seven of them reunited at the safe house in Marka.  They

15  eventually met there.  They received some training in the

16  house on AK-47s.

17         And eventually they left and went down to Baraawe,

18  where they stayed at a second safe house.  Baraawe, as we

19  can see on Government's Exhibit 158 from trial, is to the

20  southwest of Marka.

21         The defendant stayed there, where he interacted

22  with Omar Hammami and other terrorists or men charged with

23  terrorism offenses by the United States.  And at present men

24  such as Hammami who have a $5 million award offered for

25  their arrest and conviction by the State Department, it was

1    men such as these that Mr. Hassan and his cohorts

2    encountered when they got to Baraawe.

3         In Baraawe they were issued AK-47s.  The men had

4    raised the money to gather -- or gathered the money to pay

5    for these AK-47s by calling back to the United States, to

6    young women here in the United States and having those women

7    send money over to the men.

8         And during this period of time, I believe as

9    Mr. Ahmed testified before Your Honor, their time in Marka

10   and Baraawe was not marked by unpleasantness or harsh

11   tactics or harsh training.  I believe one of the witnesses

12   in the trial said that they were allowed to go to the beach,

13   they were allowed to go out in the community.

14        And the government would submit that during this

15   period of time any remorse that these men had made about

16   their decision wasn't terribly evident because they were

17   enjoying themselves.  That adventure they were looking for

18   existed.

19        From there Mr. Hassan and the others went down to

20   Kamsuma, a training camp outside of the city or village of

21   Kamsuma.  When they arrived there two of Mr. Hassan's

22   colleagues, Mr. Ahmed and Mr. Isse, returned to the United

23   States.  They became disenchanted both with the building of

24   the camp and, as they say, with al-Shabaab's ideology.

25        Mr. Hassan did not make the same decision.  He

1    stayed through the camp, had no -- I have spent a good deal

2    of time with Mr. Hassan since 2009 and with Ms. Atwal.  I

3    have no doubt he regrets that decision, but the decision he

4    made was to stay at the camp and to complete the camp and

5    graduate.

6            During that camp a video was created.  If we could

7    go to Exhibit 6.  We're not going to play the video.  We

8    have admitted a copy for Your Honor and for the record.  But

9    at that camp were men such as Mukhtar Robow, pictured on the

10   left here, and, as the defendant candidly testified, Saleh

11   Nabhan on the right, Saleh Nabhan in al-Qaeda in east

12   Africa, a trainer who was at Kamsuma training the young men

13   from Minnesota, of which I believe there were six there at

14   the time since Khalid Abshir developed malaria or some

15   sickness and had not traveled all the way to the camp.

16           During the camp Mr. Hassan has explained before

17   Your Honor during his testimony that members of the camp,

18   the leaders of the camp blame the United States for the

19   Ethiopian invasion, they blame the United States for the

20   death of Aden Ayrow in May of 2008.

21           Mr. Hassan may not have shared those views, we're

22   not suggesting he did, but the people who were in control of

23   men such as Mr. Hassan clearly had a hostility and an anger

24   toward the United States and attributed the Ethiopian

25   invasion to the United States.

 1              If we could go to the next slide.  During this --

 2              THE COURT:  Do you have this on tape?

 3              MR. NARUS:  Yes, sir.

 4              THE COURT:  Play it.

 5              MR. NARUS:  We have the disk we admitted as an

 6     exhibit.

 7              THE COURT:  It's probably Number 8 -- Number 9.

 8     No, Number 8.  I don't know.  Give both of them to them.

 9     They will know.

10         (Pause.)

11              THE COURT:  Can they play it on ours?

12              THE CLERK:  No.  It's formatted for a computer.

13              MR. NARUS:  Your Honor, may I approach and get

14     some water?

15              THE COURT:  You may.

16              MR. NARUS:  Your Honor, before we play that, just

17     for the record we are showing the portion of the video of

18     the Kamsuma training camp referred to as "No Peace Without

19     Islam" and we are at about time stamp 9:55, I believe is

20     where Mr. Hassan's remarks begin.

21         (Video recording played.)

22              MR. NARUS:  Your Honor, whether or not Mr. Hassan

23     came up with those words or not, we're not suggesting he

24     didn't.  Let me say that again.  We're not saying we

25     disbelieve him.

1          Regardless, though, the point is that this video

2     is now on YouTube and it will be.  This is an al-Shabaab

3     propaganda video and a portion of the defendant's offense is

4     providing himself at al-Shabaab's disposal.

5          And what happens there is not only does one end up

6     in an ambush, but one ends up, whether one has written the

7     words or not, as an actor in an al-Shabaab propaganda video

8     espousing their ideology back to the community in English

9     and encouraging others to come to Somalia, which is what

10    happens here.

11         Mr. Hassan says that every time he sees this video

12    he feels sick to his stomach.  And I can tell Your Honor

13    that the same reaction has been conveyed to us when we've

14    watched this video with him in trial preparation sessions, a

15    distaste for it from Mr. Hassan, and we've watched it many

16    times going through it to find out who is involved and who

17    is behind those face guards.

18         Following this camp the object of the conspiracy,

19    what had begun here at Ainu Shams, at the Abubakar

20    As-Saddique mosque here in the Twin Cities, was realized in

21    Somalia.  Four men from Minnesota, Mr. Hassan, Shirwa Ahmed,

22    Dahir Gure, and Ahmed Ali Omar, participated in an ambush or

23    an al-Shabaab attack of Ethiopian soldiers who were en route

24    to Somalia.  They were coming into Somalia I believe near

25    Bardale, a city on the map that the government has admitted

1    earlier.

2            The ambush video was videotaped.  The ambush

3    attack was videotaped by al-Shabaab and Mr. Hassan has

4    reported that that was Jehad Mostafa, another senior figure

5    in al-Shabaab, and Omar Hammami led this ambush.  At least

6    two members of al-Shabaab died during this ambush and it's

7    unclear whether Ethiopian soldiers were killed.

8            The point is, though, that men here in Minneapolis

9    who -- in the Twin Cities, United States citizens, such as

10   Mr. Hassan, decided to go to Somalia because they disagreed

11   with the Ethiopians' presence there.  They did so secretly

12   and covertly without consulting the elders or the senior

13   figures in the mosque or without consulting their parents.

14           And that plan, from restaurants here in the Twin

15   Cities, reached its objective in the form of an attack in

16   Somalia on the Ethiopian military that, as Mr. Bryden

17   testified, was there at the invitation of the Transitional

18   Federal Government attempting to bring stability to Somalia,

19   a country desperately in need of such stability.

20           That the men didn't know they would be with

21   al-Shabaab or that al-Shabaab would be a designated foreign

22   terrorist organization doesn't change the fact that once

23   Mr. Hassan and the others got there, they were on full

24   notice about who they were joining.  This was explained to

25   them very early in the process, in December and in January.

1    They were lectured by senior members.  Sheikh Fuad came to

2    the house; Amo, the trainer.

3            Al-Shabaab, it must be remembered, is not a group

4    unknown to al-Qaeda.  There are statements from 2007 from

5    Osama bin Laden and Zawahiri extolling the activities of

6    these Islamic groups in Somalia.

7            And since then al-Shabaab has emerged and is now

8    formally affiliated with al-Qaeda.  So these groups are

9    affiliated with people who have attacked the United States

10   and continue to seek to attack the United States.

11           And this is the danger that men such as Mr. Hassan

12   when they decide here in the United States to take

13   international matters into their own hands and to leave and

14   to take up arms against a foreign government, falling in

15   with groups like al-Shabaab and becoming foot soldiers for

16   al-Shabaab is exactly the danger that the law is designed to

17   prevent.

18           It's exactly the reason why it is against the law

19   to leave the United States and go conspire to kill overseas,

20   exactly the reason why you can't provide yourself to some

21   group in Somalia called al-Shabaab that's designated as a

22   foreign terrorist organization.

23           If you yourself don't know how they threaten the

24   United States or you consider their activities to be Somali

25   centric, the decision by the United States government has

1    been made based on affiliations with al-Qaeda that

2    al-Shabaab is a foreign terrorist organization.  Mr. Bryden

3    recounted a litany of atrocities they have committed against

4    civilians, the Somali people, believing that that will

5    effect their message.

6         So, Your Honor, when Mr. Hassan and the others

7    left in the fall of 2007 they didn't appreciate this, or at

8    least Mr. Hassan and I don't believe Mr. Isse or Mr. Ahmed

9    appreciated the group that they were getting involved in.

10   By early 2008 it had been explained to them who this group

11   was and what their mission included.  By the time of the

12   ambush Mr. Hassan understood that.

13        Mr. Hassan to his credit, as I mentioned a moment

14   ago, did leave that group, he did go to Yemen.  And since

15   January of 2009 he has tried to assist the United States and

16   has done what has been asked of him with the exception of

17   that slight -- I shouldn't say "slight" -- with the

18   exception of ten weeks when he omitted aspects of the story,

19   believing that he could recount and admit his guilt without

20   implicating certain people.

21        Your Honor, in many ways this case illustrates the

22   dangers of American citizens leaving the United States to go

23   train in foreign countries with foreign terrorist

24   organizations, but it also illustrates that even under those

25   circumstances one can make the decision to return and to

1          cooperate with the United States.

2                    And Mr. Hassan essentially illustrates both

3          points.  So while he did make this mistake, the government

4          does make its motion, the United States and the government

5          submits the Court cannot overlook his offenses.  We can't

6          forget what he has -- the offenses he's committed and that

7          is joining a foreign terrorist organization in a foreign

8          country and acting at its disposal to espouse its ideology,

9          to take up arms against the Ethiopian military, and to

10         contribute toward the destabilization of Somalia by

11         combatting the Transitional Federal Government.

12                   Unless Your Honor has further questions, the

13         United States would submit.

14                   THE COURT:  The defendant's motions are denied.

15         Do you wish to be heard before sentencing?

16                   MS. ATWAL:  One other thing I want to add.  We've

17         been left with that video, the image of Kamal speaking to a

18         camera and a speech that was given to him.  So how do we

19         know that that's not something that's going to happen again?

20                   He left that group and publicly yet again he sat

21         in that chair and told the world about this organization.

22         And he didn't just speak about some little folks that were

23         involved in it.  He talked about the big folks involved in

24         it, the leaders of al-Shabaab.

25                   And I recall in a phone call that he made to

1    Somalia when he was trying to help the FBI locate other

2    missing men that he was warned that he better not be

3    cooperating with the government, he better not be working

4    with the FBI.  And he ignored that warning.  Even though he

5    knows what could happen, he has seen the videos where people

6    were beheaded or executed, he continued his cooperation.

7            And it's because of those reasons that that Kamal

8    Hassan from February of 2008, when he was 23 years old, is

9    not the same Kamal Hassan who is standing before this Court

10   as a 28-year-old and somebody who has left al-Shabaab.

11           When he left here, Your Honor, he was told it was

12   his duty.  And I know I have repeated that theme all

13   throughout my position pleading, I have repeated it here

14   today, but that is the stronghold that they pushed in front

15   of these kids.  And to verify that, they had all these

16   protests coming along around the cities and around the world

17   saying Ethiopia was committing these humanitarian rights

18   [sic].

19           And the Court is right and Mr. Narus is right that

20   we now know al-Shabaab was doing the same thing, but there

21   are verifiable reports that Ethiopian troops were doing this

22   too.

23           So when they went to his whole psyche of this is

24   nationalism, you need to do this for your country, it

25   worked.

1        He did want to leave when Salah Ahmed left.  They

2   had discussions about leaving, but as I stated in my

3   position paper, Mr. Ahmed when -- he took the first chance

4   he could leave and Kamal wasn't there and he got out when he

5   could.

6        And what do we know happened right afterwards?

7   Everything was put on lockdown, armed guards around the

8   camp, cell phones taken away.  His communication with the

9   outside world was cut off.

10        He wanted to leave well before the ambush.  After

11   the ambush is when he was able to leave and he took the

12   opportunity, got ahold of his dad and was able to make that

13   run.  And I say "run" because he did escape from al-Shabaab,

14   and that is why we know he won't go back to this.

15        Not only is it in this courtroom or in this

16   country, but remind the Court that he has cooperated with

17   international governments, too, where he has signed sworn

18   statements about what al-Shabaab is about and their

19   activities.  And that someday, depending on the

20   prosecutions, will be made public.

21        That's why he's never going to go back to it,

22   right there.  He has no reason to.  He left for a reason.

23   He's cooperating for that reason.  And I ask the Court to

24   keep that in mind.

25        THE COURT:  Mr. Hassan, would you please move to

1     the microphone.  This is your opportunity to speak to me.

2     You have an absolute right to talk to me, tell me anything

3     that you want to tell me about yourself, about the offenses

4     that you have pled guilty to, or anything else that you

5     think I should know before I sentence you.  Please talk to

6     me.

7                THE DEFENDANT:  Thank you, Your Honor, for this

8     opportunity.  I have been waiting for this for the past four

9     and a half years.  And I'm very nervous, so I'm sorry if

10    my --

11               THE COURT:  Take your time.

12               THE DEFENDANT:  -- voice is breaking.

13               THE COURT:  Take your time.

14               THE DEFENDANT:  Your Honor, I sat in that witness

15    chair for three days testifying for the U.S. government and

16    telling everybody what I did.  I helped al-Shabaab and I

17    lied to the U.S. government, Your Honor.

18               I can't take back what I did, but I can show you

19    and my family, the government, and the Somali community that

20    I can do better, that I'm sorry for what I did, and I will

21    continue showing you, Your Honor, that I'm a good citizen.

22    I hope my cooperation shows that and I hope my behavior in

23    the past four and a half years shows that.

24               One of the things that people ask me about my case

25    is, Your Honor, why are you being charged for something that

1    happened in a different country.  But to me, Your Honor, it

2    doesn't matter because I know what I did was wrong and

3    illegal and I take full responsibility for my actions and my

4    choices in 2007 and 2008.

5           And I'm sorry to those who I have hurt.  Your

6    Honor, my actions have deeply impacted my family.  Your

7    Honor, when I left my family lost their house and their

8    restaurant.  When I was here I was a big help to them

9    financially, and I couldn't be here to help them when they

10   were going through that.

11          My mom, who is here today, Your Honor, she -- her

12   health deteriorated.  She started losing her hair, Your

13   Honor.  Her blood pressure was going up.  And she was going

14   through all of that, Your Honor, because of me, because of

15   my actions and what I did.  And I can never forgive myself

16   for putting her through that.

17          Your Honor, my family spent a lot of money looking

18   for me.  My mom and dad took turns traveling to Yemen so

19   they could be close to me in case I reached out to them.

20   Your Honor, I put a lot of stress on my family.  My brothers

21   and my sister were worried sick about me.  They didn't know

22   where I was.  They always looked up to me and I let them

23   down, Your Honor, by making this choice.

24          By going to Somalia I let my family down, I let my

25   country down, and I let my community down.  Your Honor,

1    despite all of that, in spite of everything that I did and

2    what happened, my family, they still stood by my side and

3    they still supported me.

4         My parents got separated, Your Honor, and -- which

5    is very painful because I blame myself.  I know if I had

6    never left that my mom and dad would still be together

7    today.

8         And I hope my family knows how much I love them

9    and how much I appreciate everything they have done for me,

10   Your Honor.  They put their life on hold these past six

11   years that this whole thing was going on and they are taking

12   care of my wife and my son as we speak today, Your Honor.

13        Your Honor, my wife lives with my family.  She --

14   when she gave birth to our son I was in a jail cell in

15   Ramsey County, Your Honor, and I couldn't be there.  I

16   couldn't witness the birth of my first child, Your Honor,

17   because of my actions, because of what I did.  I couldn't be

18   in that delivery room to hold my wife's hand and support her

19   and that hurted me deeply, Your Honor, and it also hurted my

20   family.

21        I missed the first three years of my son's life.

22   He's three years old now, Your Honor.  I missed his first

23   words.  I missed his first step, Your Honor.  I missed a lot

24   of important things that a father should not miss.  My

25   father never missed a day of my life.  I failed my family,

1    Your Honor, for putting them through this.

2         Your Honor, I don't want to miss any more of my

3    son's life.  I want to be part of his life, Your Honor.  I

4    want to be there for him.  And I would like to be given the

5    opportunity to be with my family, Your Honor, so I can

6    support them and help them like they have helped me.

7         Your Honor, my actions have also impacted the

8    Somali community, Your Honor.  I think some of them are here

9    today.  Your Honor, the Somali people in Minneapolis are

10   hardworking people, peace-loving people, Your Honor.  They

11   left Somalia just so they can have peace and security for

12   their families, Your Honor, and I believe that my action has

13   damaged their image.  Your Honor, I attracted negative media

14   attention to the community.

15        And I hope they know how sorry I am, Your Honor,

16   and it was never my intention to do that.  I hope my

17   cooperation with the U.S. government has repaired that image

18   and I hope my testimony have answered some of the questions

19   that they had, Your Honor.

20        Your Honor, my actions have also impacted the

21   United States for helping al-Shabaab, Your Honor.  Your

22   Honor, America has done so much for my family and I.  They

23   helped us when we desperately needed help.  They gave us

24   food, Your Honor.  They gave us shelter and they took us

25   away from poverty, Your Honor, and brought us to America.

1   And we had so many opportunities here.  I went to school.  I

2   got financial aid.  Your Honor, all my brothers attended

3   college.  And me going overseas I think was a slap to the

4   U.S., to the United States of America, Your Honor.

5            And one of the reasons why I left al-Shabaab, Your

6   Honor, is because they had anti-American views.  They didn't

7   like the West in general.  And I didn't want to be part of

8   any group, Your Honor, that had views like that and that's

9   why I ran away.

10           And I want the American people to know, Your

11  Honor, that I'm very sorry for what I did and I also want

12  them to know that I no longer help or support al-Shabaab or

13  any group like them.

14           Your Honor, I don't know what you're going to do

15  today, I don't know what my sentencing will be, but I can

16  promise you one thing, Your Honor, I will keep my word to

17  you.  No matter what happens, I will keep my word, I will

18  keep working hard, I will keep cooperating and helping the

19  United States government.

20           Your Honor, I will work hard for my family.  I

21  will go to school or get a job, do whatever it takes to

22  support my family, Your Honor, because God knows how much

23  they helped me through this whole mess.

24           Your Honor, I hope my words mean something to you,

25  I hope my letters mean something because I can't express to

 1      you enough how sorry I am about everything I did.

 2              Thank you.

 3          (Pause.)

 4              THE COURT:  Well, I heard a lot of sorries and, as

 5      you well know, I grilled you on the stand when you were

 6      testifying and your talk here has reared that ugly head in

 7      my mind that I've seen so often with these cases, is that we

 8      have people that are very, very bright and can be very, very

 9      devious.

10              You deceived your father, who was a very strong

11      man in his community and was very strong in your household

12      and was trying to make sure that you were doing the right

13      thing.

14              You graduated from Wayzata High School and you

15      went on to college, so you're intelligent.  You're

16      articulate here.  You were able to within a very short time

17      come up with a plan to deceive your father, not to go down

18      to Cancun and drink and carouse around and be with your

19      buddies, but go to essentially a foreign land for you since

20      you had not been there since you were a baby.  You didn't

21      know the country.

22              I grilled you at your trial to see whether or not

23      your father talked about hatred of Ethiopians and the wars

24      that the Ethiopians have fought with the Somalians, and you

25      said no.  You had no history of that.  There was no hatred

1    in your family towards Ethiopia.  But within a microsecond

2    of your life you went on an adventure to hold an AK-47.  You

3    could have gone to the store and bought one and gone to the

4    gun range.

5            There's no way that you can convince me that you

6    getting on a plane to go to Somalia that you didn't know if

7    you were going to engage in fighting with the Ethiopians,

8    that that meant violence and dying.

9            I asked you on the stand whether or not you

10   understood that and whether or not you had picked up a gun

11   while you were here in the United States, whether or not you

12   had any training with a gun, you ever shot anybody, were you

13   involved in any of the Somali gangs that have ravaged your

14   community; and you said no.

15           I asked you if you knew the Quran, and you said

16   your family wasn't very religious and essentially you hadn't

17   even read the Quran.

18           But I have a young man in front of me that went to

19   Somalia, lied to his parents, stayed in a safe house where

20   people were doing unimaginable things to other Somalis.  You

21   went to a training camp.  You built the training camp.

22           You even had two people from Minnesota that acted

23   like Minnesotans and said this is too hard of work, I want

24   to go back home and play video games leave while you stayed.

25   You stayed and you had the opportunity to meet the more

1    higher-ups in al-Shabaab.  You had training on how to shoot

2    an AK-47.  You had training about how to go about an ambush.

3    When you had the training to have an ambush, nothing in your

4    body said, My God, what am I doing?  I'm going to get killed

5    or I might kill somebody.

6         You've told the government that you went off on

7    this trek to ambush the Ethiopians and you laid in the dirt

8    and you didn't fire a gun.  But I don't believe it.  I'll

9    never believe that.

10        Because if you said that you had fired a gun, you

11   know exactly what that would do.  That would dig your hole

12   deeper and deeper, just like you kept from the government

13   for a long period of time that you were even involved in an

14   ambush because you knew that if you told them that you had

15   trained and that you had a gun and that you practiced

16   shooting it, that you were more involved than you wanted

17   them to know.

18        Now, I know this case backwards and forwards.  All

19   of a sudden you're locked up.  You go on a bushwhacking

20   expedition to kill some Ethiopians.  You didn't go to shake

21   their hands or break bread with them or talk to them about

22   going back to Ethiopia.  You had guns.  You were going to

23   shoot them.

24        You had a big weapon that misfired, it couldn't

25   work, and you had to retreat.  And you got back to the camp

1    and all of a sudden everyone is happy and so you get to

2    leave, you get your freedom.

3           Now, to me, if it was a disaster and things didn't

4    work out and the foot soldiers didn't do the things they

5    were supposed to do, it would seem like the army would make

6    you do double duty and double down.  But you're telling me

7    and you've told the government and the government believes,

8    but I do not believe, that there was joy and a celebration.

9           You destroyed your family's life, and that's what

10   you talk about, but that doesn't measure up to what you did.

11   It's not like you are a person of mental disability that you

12   can't think straight.  You deceived your family, who knows

13   you the best, and that takes something.

14          And then you deceived the FBI.  It wasn't a day.

15   It wasn't an hour.  It was weeks that you kept the story

16   going, not sweating, not being able to not sleep in fear of

17   being caught in your lie, but being housed in a hotel where

18   you had conjugal visits with your wife.

19          And everyone talks about you being mature, but

20   you're not mature.  You never thought about not bringing a

21   child into this world because you know that you were going

22   to prison for a period of time.  You didn't care about your

23   wife.  Because if you were in prison, who was going to take

24   care of her and who was going to take care of the child?

25          So let's get down to it.  I don't know you, the

1    government doesn't know you, your family doesn't know you,

2    and certainly this government doesn't know you.

3            Now, I am put in this position of -- it's the

4    position that we have in our sentencing laws.  You're the

5    first one to come forward.  You're the first one to break

6    open the door for the government so they could see what was

7    happening, because no one was talking, no one knew because

8    it was secret, what was happening to these young individuals

9    going off to Somalia.  So you've bought time off your

10   456-month sentence.

11           And why aren't you lying to me?  I have no indicia

12   that you're not.  I had that video shown for a reason.  You

13   convinced the FBI and the government that someone wrote

14   those words for you.  If they did, you didn't tell us how

15   long you practiced those words and how many takes was done

16   on that tape.

17       (Discussion off the record between

18        the defendant and Ms. Atwal.)

19           THE COURT:  It sounds like there were, so why

20   don't you tell me.

21           THE DEFENDANT:  Your Honor, that -- there's many

22   things that you have said, Your Honor.  For example, you

23   said that you don't believe that I didn't fire my weapon.

24   Your Honor, I did not fire my weapon.

25           THE COURT:  We could spend all day on that.

1      You're not going to convince me otherwise.

2             THE DEFENDANT:  Okay.  You said when Salah and

3      Abdifatah left.  I didn't know about the plan they made,

4      Your Honor.  They left and as they were leaving I found out

5      that -- Salah told me he is going to the doctor and

6      Abdifatah said that he is going to go to a family member,

7      that they got permission.  Your Honor, I didn't know they

8      weren't coming back.  I had no idea of their plan.  And had

9      they included me, Your Honor, I would have went with them.

10            THE COURT:  There may have been a reason why they

11     didn't include you, but move on.

12            THE DEFENDANT:  And the speech, Your Honor, it was

13     written for me by Farouk, one of the leaders of the camp.

14     One of the reasons they picked me, they said that they

15     needed someone from the United States, the group that

16     traveled together from Minnesota.

17            THE COURT:  I know all that.  I'm asking you how

18     many times you practiced it, how long did you practice it,

19     how many takes did they take of you doing that.

20            THE DEFENDANT:  Your Honor, there was three takes.

21     I messed up the first two and the one we see today is the

22     third one.

23            THE COURT:  And how long did you practice this

24     speech?

25            THE DEFENDANT:  I practiced -- I got that speech

1    in the morning, Your Honor, and then I was practicing the

2    whole day, probably four to five hours, before I got on the

3    tape.

4              THE COURT:  Now, you've watched that tape.  And

5    you know that you're very convincing, aren't you?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  All right.  For the government, your

8    position on sentencing?

9              MR. NARUS:  Yes, Your Honor.  The government

10    concurs with the Probation Office and the Court's guideline

11    calculations that the guideline range is 456 months based on

12    the statutory maximum of three hundred -- or 456, 38 years.

13              The government has made a 16-level downward

14    departure and the departure yields a range of 120 to 150

15    months or 10 to 12 and a half years in custody.  That is the

16    government's recommendation, Your Honor.

17              THE COURT:  On February 18, 2009 the defendant

18    pled guilty to Counts 1 and 2 of a two-count information.

19    On August 12, 2009 the defendant pled guilty to Count 3 of a

20    supplemental information.  And the counts are as follows:

21    Count 1 of the two-count information, it was providing

22    material support to terrorists, in violation of Title 18,

23    United States Code, Section 2339A(a), a Class C felony;

24    Count 2, providing material support to a foreign terrorist

25    organization, in violation of Title 18, United States Code,

1   Section 2339B(a)(1), a Class C felony; and Count 3 of the

2   separate information, false statements, in violation of

3   Title 18, United States Code, Section 1001(a)(2), a Class D

4   felony.

5           The advisory guidelines are as follows as found by

6   the Court:  Total offense level of 44, criminal history

7   category of VI, custody range of 456 months in prison,

8   supervised release two years to life, fine range of 25,000

9   to 250,000 dollars, and a special assessment of $300.

10          The Court has read the presentence investigation

11  report and reviewed it.  The Court has read and reviewed all

12  the submissions that have been given to the Court by the

13  government and by the defense counsel.

14          The Court has received from the government a

15  motion for a 5K1.1 motion for a downward departure because

16  of substantial assistance to the government.  The Court has

17  read the *in camera* submission to the Court and heard

18  arguments in open court regarding why the Court should grant

19  that motion, both from the defense and from the government.

20          And it is clear that the defendant has given

21  extraordinary, extraordinary cooperation to the government

22  in order to break open this conspiracy and the Court grants

23  the government's motion for substantial assistance.  The

24  Court has denied all of the other defense motions dealing

25  with variance and downward departures.

1          The Court will sentence as follows -- the Court

2     has reviewed and read all the pertinent United States

3     Supreme Court decisions dealing with sentencing plus all the

4     Eighth Circuit Court of Appeals decisions dealing with this

5     sentence, any decisions by other courts in other circuits

6     that dealt with the issues at hand.

7          The Court has also received from the government

8     and from the Probation Office -- excuse me -- from the

9     Probation Office from the Sentencing Guideline Commission

10    all of the sentencings across the nation dealing with

11    terrorist activities that are charged under the specific

12    charges here to make sure that this defendant and all the

13    other defendants that will be sentenced this week are within

14    the same appropriate range if their factual situation

15    applies.

16         The Court sentences as follows -- the Court has

17    also reviewed the factors under Title 18, 3553(a), and will

18    apply those in sentencing the defendant because it's

19    mandatory.

20         The defendant is hereby sentenced to the care and

21    custody of the Bureau of Prisons for a term of 120 months.

22    The term consists of 120 months on each of Counts 1 and 2.

23              And I can do 120 on Count 3?

24              PROBATION OFFICER:  96 months, Your Honor.

25              THE COURT:  96 months on Count 3, all to be served

1    concurrently.

2              No fine is imposed.  Restitution is not applicable

3    to this case.

4              The defendant is sentenced to a term of 20 years

5    of supervised release.  The term consists of 20 years on

6    each of Counts 1, 2, 3 -- of 1 and 2 and three years on

7    Count 3, all such terms to run concurrently.  The mandatory

8    conditions that are applicable are as follows:

9              The defendant must report to the United States

10   Probation and Pretrial Services Office in the district to

11   which the defendant is released within 72 hours of release

12   from the custody of the Bureau of Prisons.

13             Next, the defendant shall not commit any crimes,

14   federal, state, or local.

15             Next, the defendant must be involved with

16   mandatory drug testing.  The Court is going to suspend that

17   based on the Court's determination that the defendant poses

18   a low risk of future substance abuse, pursuant to Title 18,

19   United States Code, Sections 3563(a) and 3583(d).

20             Next, the defendant shall not possess a firearm,

21   ammunition, destructive device, or any other dangerous

22   weapon.

23             Next, the defendant shall cooperate in the

24   collection of DNA as directed by the probation officer.

25             Next, the defendant shall abide by the standard

1   conditions of supervised release that have been adopted by

2   the Court, including the following special conditions:

3         If not employed at a regular lawful occupation as

4   deemed appropriate by the Probation Office, the defendant

5   may be required to perform up to 20 hours of community

6   service per week until employed.  The defendant may also

7   participate in training, counseling, daily job search, or

8   other employment-related activities as directed by the

9   probation officer.

10         Next, the defendant shall submit his person,

11   residence, office, vehicle, or any area under the

12   defendant's control to a search conducted by the United

13   States Probation Office or supervised designee at a

14   reasonable time in a reasonable manner based upon reasonable

15   suspicion of contraband or evidence of a supervision

16   violation.  The defendant shall warn any other residents or

17   third parties that the premises and areas under the

18   defendant's control may be subject to searches pursuant to

19   this condition.

20         And finally, there's a $300 special assessment --

21   that's $100 per count that you have pled guilty to, total of

22   $300 -- which has to be paid immediately to the Crime

23   Victims Fund.

24         Sir, if you feel the Court has not followed the

25   law in the imposition of your sentence, you have a right to

1    appeal your sentence to the Eighth Circuit Court of Appeals,

2    which sits in St. Louis, Missouri.  Ms. Atwal will be your

3    attorney on that appeal.  You have an absolute right to

4    appeal my sentence.  That court is the higher court and they

5    review whether or not I followed the law or the Constitution

6    in sentencing you.

7            And because of the number of issues involved in

8    this case, you sit and talk to Mr. Mohring and Ms. Atwal and

9    see whether or not you wish to appeal the Court's rulings

10   and decisions on your sentencing.

11           But in any event, you have 14 days from today's

12   date to file that notice of appeal.  You can have Ms. Atwal,

13   you can represent yourself, or you can hire your own

14   attorney, but that notice has to be filed within 14 days of

15   today's date to give notice to the court that you are

16   appealing my sentence.

17           And if the government doesn't feel that the Court

18   has followed the law, they can appeal also.

19           Anything further for the defense on this matter?

20           MS. ATWAL:  Your Honor, for the record, I would

21   ask the record reflect my objection to the reasonableness of

22   the sentence.

23           THE COURT:  It is so noted.

24           MS. ATWAL:  Thank you.

25           THE COURT:  Anything further for defense?

1              MS. ATWAL:  No, Your Honor.

2              THE COURT:  Anything further for the government?

3              MR. NARUS:  No.  Thank you, Your Honor.

4              THE COURT:  Remanded to the custody of the

5    Marshal.

6              (Court adjourned at 3:55 p.m.)

7                        *      *      *

8

9

10

11

12         I, Lori A. Simpson, certify that the foregoing is a

13   correct transcript from the record of proceedings in the

14   above-entitled matter.

15

16              Certified by:  *s/ Lori A. Simpson*

17                             Lori A. Simpson, RMR-CRR

18

19

20

21

22

23

24

25